# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 137 - 1 | **DATE** | 9/9/2003 |
| **CASE TITLE** | | USA vs. RONALD MIKOS | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The provisions within the Federal Death Penalty Act allow for the executive and judicial branches to act in accordance with all of a defendant's constitutional rights. For the foregoing reasons, this court denies Mikos' motions to declare the penalty unconstitutional. [47-1, 47-2, 47-3, 48-1, 48-2, 48-3, 49-1, 49-2, 49-3, 50-1, 50-2, 50-3, 51-1, 51-2, 51-3, 52-1, 52-2, 52-3, 53-1, 53-2, 53-3]

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | SEP 11 2003 date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 9/9/2003 |
| CG | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | CG mailing deputy initials |

Document Number

101

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 02 CR 137-1 |
| | ) | |
| | ) | Hon. Ronald A. Guzmán |
| RONALD MIKOS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before this court are defendant, Ronald A. Mikos's motions to declare the Federal Death Penalty Act of 1994 unconstitutional. For the reasons provided in this memorandum opinion and order, this court denies the motions.

## BACKGROUND

These facts are taken directly from the parties' briefs. Defendant, Ronald A. Mikos ("Mikos"), a licensed podiatrist, allegedly conducted an ongoing scheme to defraud Medicare by submitting false claims for extensive podiatric procedures from approximately 1994 until February of 2002. Mikos's billing patterns triggered an administrative review of a sample subset of claims he previously submitted for payment. Upon request for documentation substantiating actual performance of his claims, Mikos allegedly manufactured and tendered false and fraudulent patient records and generated and caused the signing or forging of false and fraudulent attestations by patients, among other things. Consequently, referral of this matter to the United States Attorney resulted in the initiation of a grand jury investigation. The grand jury investigation included the

DOCKETED
SEP 1 1 2003

interviewing of several of Mikos's past and present patients. In some instances, patients were served with subpoenas directing their appearance before the grand jury. Joyce Brannon, a former patient of Mikos, was one of these individuals. She was scheduled to testify before the grand jury on January 31, 2002. Approximately one week prior to her appearance before the grand jury, Mikos allegedly contacted her and sought to convince her that she should not testify or should claim a lack of memory. Brannon insisted on testifying truthfully. Three days after the alleged phone call, Brannon was found dead, shot six times at close range with a .22 caliber weapon, in the church rectory room where she lived.

On November 14, 2002, a federal grand jury returned a twenty-five count superseding indictment charging Ronald A. Mikos with mail fraud, in violation of 18 U.S.C. § 1341, (Counts One through Fourteen); health case fraud, in violation of 18 U.S.C. § 1347, (Counts Fifteen through Nineteen); obstruction of department proceedings, in violation of 18 U.S.C. § 1505, (Count Twenty); obstruction of grand jury proceedings, in violation of 18 U.S.C. § 1512(b), (Counts Twenty-Two through Twenty-Four); and killing a federal witness to prevent her appearance before a federal grand jury, in violation of 18 U.S.C. § 1512(a)(1)(A), (Count Twenty-Five).

As indicated by the government, witness tampering by means of murder is an offense potentially punishable by death, contingent on the existence of certain statutorily prescribed mental culpability and aggravating factor requirements. The superseding indictment included a Notice of Special Findings that alleged Mikos was eighteen years or older at the time of the offenses, possessed one of the four *mens rea* described in 18 U.S.C. § 3591, and committed two of the sixteen specifically described aggravating

2

factors for homicide listed in 18 U.S.C. § 3592(c). On December 16, 2002, the

government filed a Notice of Intent to Seek the Death Penalty ("Notice of Intent"),

repeating the *mens rea* allegations and the two statutory aggravating factors described in

the Notice of Special Findings. In addition, the Notice of Intent described three non-

statutory aggravating factors the government would rely upon, citing 18 U.S.C. § 3593(a)

and (c).

In seven separate motions, Mikos has moved this court to declare the Federal

Death Penalty Act of 1994 (the "FDPA") unconstitutional, strike the special findings

from the superseding indictment, and dismiss the Notice of Intent to Seek the Death

Penalty in this case. Mikos's motions mandate a declaration of the FDPA's

unconstitutionality because: (1) the FDPA provides for written notice by the government

and not for indictment by a grand jury as required by the Constitution; (2) the relaxed

evidentiary standard applicable to the sentencing phase of trial violates the Fifth and

Sixth Amendments; (3) the sentence of death denies the continued opportunity for

exoneration in violation of the Fifth and Eighth Amendments; (4) the death penalty is

under all circumstances cruel and unusual punishment; (5) the FDPA's sentencing

scheme is incomprehensible to a jury, in violation of the Fifth and Sixth Amendments;

(6) the FDPA fails to adequately narrow the class of persons eligible for the death

penalty; and (7) a jury's consideration of non-statutory aggravating factors violates the

United States Constitution. For the reasons that follow, Mikos's motions are denied.

# DISCUSSION

## A. Mikos's Indictment Motion

Mikos first argues that the recent decisions of *Jones v. United States*, 526 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and *Ring v. Arizona*, 536 U.S. 584 (2002) necessitate a finding that the facts used to justify the imposition of the death penalty are functional equivalents of elements of the capital offense and must therefore be charged in the indictment, found by a jury, and proved beyond a reasonable doubt. With this contention, the Court agrees. However, Mikos asks this court to go one step further and declare the FDPA unconstitutional because it fails to require a grand jury indictment of these facts.

A brief discussion of *Jones* and its progeny is necessary for a comprehensive understanding of both parties' arguments in several of the following motions. This triumvirate of cases created a platform on which to distinguish traditional sentencing factors from sentencing factors that constitute functional equivalents of elements of an offense.[1] In *Jones*, the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 526 U.S. at 243 n.6. One year later in *Apprendi*, the Court confirmed its earlier holding, stating:

> [W]hen the term 'sentence enhancement' is used to describe an increase

---

[1]An extensive analysis of the "element versus sentencing factor" discussion may be found in *United States v. Fell*, 217 F. Supp. 2d 469, 478-84 (D. Vt. 2002).

> beyond the maximum authorized statutory sentence, it is the *functional equivalent* of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of the offense."

530 U.S. at 494 n.19 (emphasis in original). *Apprendi* explained that the Court's focus was not on the label or structure of the statute, but its effect on a defendant's maximum sentence. Id. at 494 ("Despite what appears to us the clear 'elemental' nature of the factor here, the relevant inquiry is one not of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"). Just last year in *Ring*, the Court applied *Apprendi*'s holding to Arizona's capital punishment statute and held that "capital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. In so ruling, the Court generally described the enumerated aggravating factors as "the functional equivalent of an element of a greater offense." Id. (quoting Apprendi, 530 U.S. at 494 n.19). The Court expressly held that *Apprendi* overruled its previous decision in *Walton v. Arizona*, 497 U.S. 227 (1990), which previously defined factors guiding the choice between life and death as mere "sentencing considerations." 536 U.S. at 589. Thus, these holdings help guide this court's discussion of each motion concerning the FDPA's aggravating factors.

### 1. Treatment of Facts as Essential Elements of the Offense

Mikos argues that the FDPA treats aggravating factors necessary for imposition of the death penalty as sentencing considerations rather than as elements of a greater

offense. (Def.'s Indictment Mot. at 4.) Such treatment, he continues, is in stark contrast with *Ring v. Arizona*, where the Supreme Court characterized aggravating factors as "the functional equivalent of an element of a greater offense," 536 U.S. at 609.

Mikos calls attention to the language, structure, and procedure of the FDPA as evidence of Congress's intention to treat these facts as sentencing considerations. Nowhere in the plain language of the statute, he explains, does the FDPA refer to aggravating factors as "elements" or provide for their consideration by a grand jury. (Def.'s Indictment Mot. at 4.) Mikos also calls into question the structure of the FDPA, pointing out that the statute falls within Part II of Title 18 of the Code, which is entitled "Criminal Procedure" and located among chapters of the Code that deal with sentencing issues. (Def.'s Indictment Mot. at 4-5.) Both the plain language and the structure of the FDPA, Mikos concludes, clearly display Congress's intention to treat the facts necessary for imposition of the death penalty as sentencing considerations. Unfortunately, the assumption underlying this premise-that the form of the statute matters-is incorrect. The triumvirate of cases upon which Mikos relies clearly holds that it does not matter how the required finding is labeled, but rather, what is important is whether it exposes the defendant to a greater punishment than that authorized by the jury's verdict. *See* Jones, 526 U.S. at 243; Apprendi, 530 U.S. at 494; Ring, 536 U.S. at 602. The government quotes *Ring*, where the Supreme Court stated, "If a State makes an increase on a defendant's authorized punishment contingent on the finding of fact, that fact-*no matter how the State labels it*-must be found by a jury beyond a reasonable doubt." (Gov't's Resp. at 13) (quoting Ring, 536 U.S. at 602)). It is apparent from this holding that the guiding principle in determining the status of a statutory fact is the consideration of its

6

*effect* on a defendant's punishment, not the *form* in which it is presented. This court finds, consistent with the holdings of *Jones*, *Apprendi* and *Ring*, that the mental culpability requirements set forth in § 3591(a) and the statutory aggravating factors set forth in § 3592(c) increase the maximum penalty beyond that provided in 18 U.S.C. § 1512(a)(1)(A). Therefore, these requirements are considered the functional equivalents of a greater offense.

Mikos's assertion that Congress's procedural choices are consistent *only* with treatment of aggravating factors as sentencing considerations is improper for the same reasons set forth above. Additionally, this argument does not prevail. Unlike the Arizona capital sentencing scheme at issue in *Ring*, which allowed a trial judge to determine the presence or absence of statutory aggravating factors, the FDPA requires such factors to be found by a jury beyond a reasonable doubt. *See* 18 U.S.C. § 3593. This provision, enacted eight years prior to the Court's decision in *Ring*, is wholly consistent with the treatment of statutory aggravating factors as elements of an offense.

While this court agrees with the government's classification of functional equivalents of elements of an offense, it is dubious of the government's proposed *handling* of these elements; the government contends that the status of death-eligibility factors as functional elements of the offense rather than as substantive elements allows for their disparate treatment. Gov't's Resp. at 14. The government cites *United States v. Johnson*, 239 F. Supp. 2d 924 (N.D. Iowa 2003), a case in which the United States District Court for the Northern District of Iowa recently held:

> Under *Ring* and *Apprendi*, "aggravating factors" are not "elements" of a distinct capital offense, but the functional equivalents of elements in the specific sense that they increase the maximum penalty for the offense, with

7

> the constitutional consequence that such factors must be found by a jury beyond a reasonable doubt.

(Gov't's Resp. at 14 (quoting Johnson, 239 F. Supp. at 939).) The Court disagrees with the narrow holding espoused by *Johnson* and finds that functional equivalents of elements, while not actual elements of a new substantive offense, must comply with *all* of the procedural safeguards provided for within the Fifth and Sixth Amendments of the Constitution. To hold otherwise would render substantial portions of *Jones* inoperative. In *Jones*, the Supreme Court held:

> [U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be *charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.

Jones, 526 U.S. at 243 n.6 (emphasis added). *Jones* and its progeny undisputedly set forth constitutional rules of procedure rather than "decision[s] of substantive constitutional law." Apprendi, 530 U.S. at 475. We agree with the government that there is an inherent difference between *actual* elements of an offense and *functional equivalents* of an offense. However, the constitutional safeguards guiding the consideration of functional equivalents are not limited to a jury determination beyond a reasonable doubt. *Jones* additionally required that these factors be charged in an indictment and presented to a grand jury. Lest any confusion remain, this court explicitly holds that the characterization of any fact as the functional equivalent of an element of an offense carries with it the requirement that the fact be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Jones, 526 U.S. at 243 n.6. The form and structure of these factors, and procedure in which they operate, do not

persuade the Court to hold otherwise.

**2. Failure To Provide Explicitly for the Government To Obtain an Indictment When the Death Penalty Is Sought**

As previously discussed, functional equivalents to elements of an offense must be charged in an indictment and presented to a grand jury. Mikos contends that because the FDPA fails to explicitly provide for indictment of aggravating factors, but instead specifies the form of notice the government must provide, it violates his Fifth Amendment right to a grand jury indictment. (Def.'s Indictment Mot. at 6.) He correctly asserts that the FDPA's written notice provision, § 3593(a), is insufficient on its own to satisfy the constitutional demands of *Jones*, *Apprendi,* and *Ring*. However, the Court finds that the superseding indictment and Notice of Special findings filed by the government on November 14, 2002 satisfies the constitutional requirements of the Indictment Clause.

The government illuminates two functions of the Fifth Amendment's Indictment Clause. (Gov't's Resp. at 16.) First, the clause serves as a check on prosecutorial power by entitling "a defendant to be in jeopardy only for offenses charged by a group of his fellow citizens acting independently of either the prosecutor or the judge." United States v. Field, 875 F.2d 130, 133 (7th Cir. 1989) (citing Stirone v. United States, 361 U.S. 212, 217-19 (1960)). Second, the Indictment Clause "entitles a defendant to be apprised of the charges against him so that he knows what he must meet at trial." Field, 875 F.2d at 133. As held in *Hamling v. United States,* "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against

which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." 418 U.S. 87, 117 (1974).

A similar argument to the one currently before us was considered and rejected in *United States v. Fell*, 217 F. Supp. 2d 469, 484 (D. Vt. 2002). The court in *Fell* reasoned as follows:

> The superseding indictment in this case satisfies the requirements of the Indictment Clause. When it returned a true bill, the grand jury performed its check on prosecutorial power by determining probable cause exists to find that the specified mental culpability and aggravating factors exist. The superseding indictment informs Fell that he is charged with a capital offense and specifies the factors that, if proven, will render him eligible for a death sentence.

217 F. Supp. 2d at 484. As articulated in *Fell*, the FDPA's silence "does not suggest that Congress intended to forbid grand jury participation or to exclude these factors from an indictment. On the contrary, Congress has provided for the grand jury's involvement in charging federal capital offenses in Rule 7 of the Federal Rules of Criminal Procedure."[2] Id. In furtherance of its decision, the *Fell* court applied the principle of "constitutional avoidance," which requires that "every reasonable construction must be resorted to in order to save a statute from unconstitutionality." Id. (quoting Hooper v. California, 155 U.S. 648 (1895)); *see also* Jones, 526 U.S. at 239 ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful questions arise and by the other of which such questions are avoided, our duty is to adopt the latter") (citation omitted). It is therefore the Court's prerogative to choose the route that saves the FDPA from

---

[2]"An offense which may be punished by death shall be prosecuted by indictment . . . . The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(a), 7(c).

unconstitutionality. In accord with the holding of *Fell*, the Court finds that the FDPA does not explicitly prohibit a grand jury from deliberating and voting to indict on the factors that render him death-eligible, and therefore the statute does not violate a defendant's Fifth Amendment right to grand jury indictment of these factors. *See* <u>Fell</u>, 217 F. Supp. 2d at 484.

The Court's discussion up to this point is limited solely to the consideration of factors that, in light of *Ring*, constitute the functional equivalent of an element of an offense. Essentially, the Court has established that any factor determined to be the functional equivalent of an element of an offense must be charged in an indictment before a grand jury. Therefore, Mikos is wide of the mark in arguing that the non-statutory aggravating factors contained in the Notice of Intent to Seek the Death Penalty must be charged in the indictment. As the government properly articulates, "Unlike mental culpability and statutory aggravating factors, which determine death-*eligibility*, non-statutory aggravating factors aid in the death-*selection* process." (Gov't's Resp. at 17.) Under the FDPA's sentencing scheme, a defendant convicted of a crime potentially punishable by death cannot receive a death sentence until after the jury finds both that he was mentally culpable under § 3591(a) and at least one statutory aggravating factor from § 3592(c) is present. Thus, the presence of mental culpability and statutory aggravating factors increase the maximum punishment available to a defendant convicted of homicide from life imprisonment to death, which makes them functional equivalents of an element according to *Jones, Apprendi*, and *Ring*. The consideration of non-statutory aggravating factors, on the other hand, occurs subsequent to the death-eligibility process. At this stage, the defendant is already eligible for a maximum penalty of death. Consideration of

11

non-statutory aggravating factors only assists the jury in individualizing the sentence; they never affect the maximum sentence. Therefore, non-statutory aggravating factors are more appropriately defined as "sentencing factors" as coined by the United States Supreme Court in *McMillan v. Pennsylvania*, 477 U.S. 79, 91-93 (1986) (holding that factors introduced during sentencing that do not extend a defendant's maximum punishment beyond the range already available to it are sentencing factors, not elements of the offense). Non-statutory aggravating factors influence the jury's sentencing decision, but they do not allow for a more severe punishment than the maximum sentence available in their absence. This Court therefore holds that *McMillan* is dispositive to the consideration of the FDPA's non-statutory aggravating factors. Thus non-statutory aggravating factors are not functional equivalents to elements of an offense and do not have to be charged in an indictment to the grand jury.

### 3. Authority for the Grand Jury To Make Special Findings

Mikos further argues that the FDPA is unconstitutional because it provides for written notice by the government attorney after indictment rather than providing for grand jury indictment as required by *Ring*, *Apprendi*, and *Jones*. (Def.'s Indictment Mot. at 8-9.) He acknowledges several district courts that have rejected this argument on the grounds that the FDPA's mere silence regarding the procedure does not preclude special findings by the grand jury. *Id.* at 9 (citing United States v. Regan, 221 F. Supp. 2d 672 (E.D. Va. 2002); United States v. Church, 218 F. Supp. 2d 813 (W.D. Va. 2002); Fell, 217 F. Supp. 2d at 484; and United States v. O'Driscoll, No. 4:CR10-277, 2002 WL 32063818 (M.D. Pa. Aug. 22, 2002).

12

The Court agrees with the *Regan, Church, Fell,* and *O'Driscoll* and finds exceptionally convincing the government's observation that Mikos "cites no federal criminal statute which contains within itself language expressly directing presentment to the grand jury of component elements either individually or in the aggregate." (Gov't's Resp. at 22.) This court has searched unsuccessfully for any criminal statute that sets forth not only the elements of an offense, but also requires those elements to be charged in an indictment in compliance with the Fifth Amendment. Equally elusive is any criminal statute requiring that the elements of its offense be proven beyond a reasonable doubt. As the government indicates, this is because these procedural tenets arise under the Constitution. Every law must comport with the Constitution. It seems paradoxical to argue that an arson statute prohibits an arsonist from requesting a trial by jury simply because the language of the statute does not explicitly provide for such, or that Congress intended to deny a rapist an attorney because the rape statute was silent on the issue. Equally unavailing is Mikos's assertion that the FDPA precludes a grand jury indictment of its death-eligible factors simply because the statute did not overtly require an indictment.

Nonetheless, Mikos emphasizes that the FDPA is not in fact silent as to which procedure to follow, but specifically requires written notice from the government instead of indictment or special findings by a grand jury. (Def.'s Indictment Mot. at 9.) Mikos argues that this language "prohibits a different procedure made up by the Government or the Court. And the procedure Congress has purposely chosen is now clearly unconstitutional." (Def.'s Indictment Mot. at 9.) The Court disagrees and concludes instead that the "notice" requirement of § 3593(a) acted as an added precaution for the

13

benefit of the defendant prior to the Supreme Court's ruling in *Ring*. In 1994, when

Congress enacted the FDPA, *Jones, Apprendi*, and *Ring* had not yet been decided.

Congress therefore acted within the context of *Walton v. Arizona*, 497 U.S. 639 (1990),

which held that sentencing considerations were not elements of the offense. Thus, at the

time the FDPA was drafted, statutory aggravating factors and mental culpability did not

have to be charged in a grand jury indictment. Under *Walton*, the Constitution provided

no rights to a defendant with regard to these factors. Theoretically, Congress could have

drafted a constitutional statute in 1994 that both allowed a judge to determine the

existence of statutory aggravating factors by a preponderance of the evidence *and* did not

require the government to inform the defendant of these factors at any point prior to trial.

Congress chose not to draft such a statute, and instead expressly provided for

determination of these factors by a jury beyond a reasonable doubt and provided for

notice of these factors to the defendant at a reasonable time before trial. 18 U.S.C. §

3593. Accordingly, this particular act of legislation went beyond the minimum standards

required by the Constitution, and thereby provided greater protection to potential capital

defendants. Against the backdrop of *Ring*, the FDPA is a constitutional statute.

However, the notice requirement of § 3593(a) is less necessary today than it was prior to

the characterization of death-eligible factors as functional equivalents of elements.

Therefore, the FDPA's "notice" requirement does not implicitly preclude the use of a

grand jury indictment.

  With regard to Mikos's contention that the Return of Special Findings is not a

legitimate grand jury function, this court cannot agree. Both Mikos and the government

agree that no federal statute or rule of procedure explicitly empowers a grand jury to

make "special findings" concerning death-eligibility factors. In consideration of this particular issue, however, the Court finds more persuasive the government's argument that "'[g]iven the grand jury's operational separateness[,]' the Supreme Court has been adverse to 'prescribing modes of grand jury procedure.'" (Gov't's Resp. at 25 (quoting United States v. Williams, 504 U.S. 36, 49-50 (1992)). While no rule or statute specifically permits a grand jury to make special findings, the Court has found no rule or statute explicitly prohibiting the same. The Court agrees with the government's reading of *Williams*, which stated that the functional independence of the grand jury provides it with the inherent authority to "initiate investigations, examine witnesses and to conduct its deliberations." (Gov't's Resp. at 25 (quoting Williams, 504 U.S. at 48)). The grand jury may therefore make these special findings in a manner consistent with its traditional role.

## 4. Separation of Powers

Mikos argues that substantial constitutional deficiencies exist within the FDPA that require a significant amount of executive and judicial rewriting in violation of the doctrine of Separation of Powers. (Def.'s Indictment Mot. at 11-15). Mikos parallels the case *sub judice* to *United States v. Jackson*, 390 U.S. 570 (1968), in which the Supreme Court denied the death penalty as punishment for kidnapping because the statutory procedure did not account for situations where a defendant waives his right to trial by jury or enters a guilty plea. The Court found the statute unconstitutional and refused to accept several proposals by the government to "save" the statute. (Def's Indictment Mot. at 11-12 (citing Jackson, 390 U.S. at 572-73)). Even if Mikos is correct in his reading of

15

*Jackson* to mean that only Congress can cure a defective statute, this court has previously determined that the FDPA is not constitutionally defective. Mikos has repeatedly asked this court to construe the statute in such a manner that grave and doubtful constitutional questions arise. As discussed above, it is the Court's duty to avoid such questions, if possible. Thus, the Court finds it completely possible to construe the FDPA as a successfully drafted statute that, while not explicitly providing for grand jury indictment of death-eligible factors, complies with the demands of the Constitution.

## B. Mikos's "Relaxed Evidentiary Standard" Motion

Mikos's most intriguing argument in support of the unconstitutionality of the FDPA is borrowed from a decision by the United States District Court for the District of Vermont. In *United States v. Fell*, 217 F. Supp. 2d 469, 489 (2002), Judge William K. Sessions held that the relaxed evidentiary standard provided during the eligibility phase of a death penalty hearing violates a defendant's rights under the Due Process Clause of the Fifth Amendment and confrontation and cross-examination provisions of the Sixth Amendment. (Def.'s Mot. Declare FDPA Unconstitutional, to Strike Special Findings Superseding Indictment, & to Dismiss Notice Intent to Seek Sentence Death Because the Relaxed Evidentiary Standard for Death Eligibility Factors in the FDPA violates the Fifth and Sixth Amendments ("Def.'s Evidence Mot.") at 1-2.) For the reasons that follow, this court respectfully declines to follow the analysis set forth in *Fell* on the ground that § 3593's relaxed evidentiary standard strikes a constitutionally proper balance between the needs for heightened reliability and individualized sentencing by enabling the judge, as gatekeeper, to exclude constitutionally unreliable or unfair sentencing information.

16

The United States Supreme Court in *Gregg v. Georgia*, stated that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. 153, 189 (1976) (plurality op.) (discussing Furman v. Georgia, 408 U.S. 238 (1972)). Three years after its decision in *Furman*, the Supreme Court articulated two specific requirements-heightened reliability and individualized sentencing-that limit the potential for arbitrary and capricious sentences of death. First, the Supreme Court explained the need for heightened reliability in capital cases, stating:

> Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality op.) (Stewart, J., concurring). Additionally, speaking on behalf of the plurality, Justice Stewart emphasized a need for individualized sentencing, and stated "[W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson, 428 U.S. at 304 (internal citations omitted). As the government indicates, the Supreme Court long ago recognized "'sound practical reasons' for having 'different evidentiary rules govern[] trial and sentencing procedures.'" (Gov't's Resp. at 31 (quoting Williams v. New York, 337 U.S. 241 (1948)).) Around the same time as *Woodson* was decided, the Court rejected a capital

prisoner's attack on the broad evidentiary scope of Georgia's capital sentencing statute,

holding:

> We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such hearings and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is *preferable not to impose restrictions*. We think it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

Gregg, 428 U.S. at 203-04 (citation omitted) (emphasis added). The Supreme Court has

consistently upheld sentencing schemes that allow for broad consideration of evidence

during sentencing hearings. *See* Schlup v. Delo, 513 U.S. 298, 326 n.44 (1995) (holding

that reduced procedural protections at sentencing is appropriate); Romano v. Oklahoma,

512 U.S. 1, 7 (1994) (holding that "traditional latitude. . . extends to evidentiary rules as

sentencing proceedings"); Payne v. Tennessee, 501 U.S. 808, 820-21 (1991) (holding that

"a sentencing authority has always been free to consider a wide range of relevant

material"); Green v. Georgia, 442 U.S. 95, 97 (1979) (holding that exclusion of

mitigating evidence under the state hearsay rule violated due process); Jurek v. Texas,

428 U.S. 262, 276 (1976) (joint opinion) (requiring that "the jury have before it all

possible information about the individual defendant whose fate it must determine"). In

fact, the Court has explicitly held that a capital sentencer "has a constitutional obligation

to evaluate the unique circumstances of the individual defendant." Spaziano v. Florida,

468 U.S. 447, 459 (1984).

The obligation to evaluate the unique circumstances of each individual defendant

must be balanced against the essential need for heightened reliability in capital cases.

*See* Jones, 132 F.3d 241-42 ("Although the Eighth Amendment requires a heightened

18

reliability standard in capital sentencing proceedings, the jury must also receive sufficient information regarding the defendant and the offense in order to make an individual sentencing determination . . . . [T]he relaxed evidentiary standard does not impair the reliability or relevance of information at capital sentencing hearings, but helps to accomplish the individualized sentencing required by the constitution."), *aff'd*, 527 U.S. 373, 381 (1999). Indeed, "the Supreme Court has invalidated procedures that have 'tended to diminish the reliability of the [capital] sentencing determination' on due process grounds." Fell, 217 F. Supp. 2d at 476 (quoting Beck v. Alabama, 447 U.S. 625, 638 (1980)); *see also* Monge v. California, 524 U.S. 721, 732 (1998); Simmons v. South Carolina, 512 U.S. 154, 161-62 (1994); Gardner v. Florida, 430 U.S. 349, 362 (1977).

The relaxed evidentiary standard set forth within § 3593(c)[3] is Congress's way of accommodating the demands in capital cases of "heightened reliability" and "individualized sentencing." This provision clearly allows for consideration of the broad range of evidence encouraged by the Supreme Court. As stated above, however, the Supreme Court has also held that such information must still comport with due process. *See e.g.,* Romano, 512 U.S. at 12 (holding that Due Process Clause governs admissibility of evidence at sentencing phase of capital trials); Gardner, 430 U.S. at 358 ("It is now

---

[3]The section provides:

> The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c).

clear that the sentencing process, as well as the trial itself, must satisfy the requirements of due process."). The Supreme Court decided the cases requiring sentencing phase evidence to comply with the demands of due process several years before *Ring* characterized death-eligibility factors as functional equivalents of elements of a greater offense. Thus, the classification of death-eligibility factors as elements of a greater offense is irrelevant to a discussion of whether § 3593(c) comports with due process. What is relevant to our discussion, however, is a determination of the minimum evidentiary standards that the FDPA may utilize and still satisfy the demands of due process.

The ultimate inquiry facing this court is whether the FDPA must incorporate the Federal Rules of Evidence into its provisions to withstand constitutional scrutiny. The Court finds that the Due Process Clause of the Fifth Amendment and the rules of evidence are not synonymous. Rather, the Due Process Clause is the baseline standard with which a statute must comply to remain fundamentally fair, and the rules of evidence is a set of heightened procedural rules that go beyond the minimum standards required by the Fifth Amendment. As the government points out, the "Supreme Court has consistently recognized that, subject to constitutional constraints, Congress has the authority to prescribe whatever rules of evidence for the federal courts it deems appropriate." (Gov't's Resp. at 36 (citing Dickerson v. United States, 530 U.S. 428, 437 (2000))); *see also* Vance v. Terrazas, 444 U.S. 252, 365-66 (1980) (recognizing "the traditional powers of Congress to prescribe the rules of evidence . . . in federal courts"). Congress undeniably exercised its power when it enacted the rules of evidence. However, Mikos incorrectly assumes that this act of legislation resulted in the creation of

a constitutional doctrine. *See* Dickerson, 530 U.S. at 437 ("Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution."); White v. Illinois, 502 U.S. 346, 366 (1992) (Thomas, Scalia, JJ., concurring) ("Neither the language of the [Confrontation] Clause nor the historical evidence appears to support the notion that the Confrontation Clause was intended to constitutionalize the hearsay rule and its exceptions."); Williams v. New York, 337 U.S. 241, 251 (1949) ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure.").

The government more appropriately describes the rules of evidence as a mere "'nonconstitutional source[]' for controlling the admissibility of evidence in federal proceedings.'" (Gov't's Resp. at 36 (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)).) *Dowling* narrowly defined the body of evidence that violated the Due Process Clause and required such infractions to be so "extremely unfair" that it "'violate[s] fundamental conceptions of justice.'" Dowling, 493 U.S. at 342 (quoting United States v. Lovasco, 431 U.S. 783, 790 (1977)). Undoubtedly, not all of rules within the Federal Rules of Evidence, if violated, would fall within this narrow definition. Imagine, for example, that tomorrow Congress simultaneously eliminates the "Best Evidence Rule" and lowers the standards necessary to authenticate public records. Prior to these changes, a party against whom this evidence is introduced may have objected to admission of evidence by relying on the applicable provisions of the Federal Rules of Evidence. However, after Congress would have made these changes, this same party would have to show that the admission of this evidence at trial is so fundamentally

unfair that his due process rights are violated. It is therefore clear that not all of the evidentiary rules articulated in the rules of evidence would violate fundamental conceptions of justice; indeed, several rules go far beyond the constitutional requirements of due process. The appropriate inquiry, therefore, is whether the FDPA's relaxed evidentiary standards allow for the introduction of evidence so extremely unfair that it violates fundamental conceptions of justice.

Because Mikos presents a facial challenge to the constitutionality of the FDPA, "no set of circumstances [must exist] under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). The United States District Court for the Northern District of New York found quite the contrary was true. In *United States v. Matthews*, 246 F. Supp. 2d 137 (2002), the court held that "even if Congress abolished the hearsay rules or the entire Federal Rules of Evidence, the requirements of the Sixth Amendment's Confrontation Clause and the Fifth Amendment's Due Process Clause would fill the void to ensure the accused's right to a fair trial." Simply put, the Constitution exists independent of the Federal Rules of Evidence.

This concept becomes clear when the Court considers the realm of criminal trials prior to the adoption of the Federal Rules of Evidence in 1972. Adequate safeguards were certainly available to a defendant to prevent the occurrence of an unfair trial. However, a defendant's right to confront his accusers, for example, was founded solely on the Sixth Amendment. Today, a defendant can simply object to the introduction of inadmissible hearsay evidence on the grounds that it violates Fed. R. Evid. 801. Prior to the adoption of the rules of evidence, however, this same defendant had to rely on the Constitution and object on the grounds that the disputed testimony violated the

Confrontation Clause. The same would be true today if Congress eliminated the Federal Rules of Evidence. The evidence at issue in *Fell*, for example, was a statement allegedly made by Fell's deceased co-conspirator-testimony that would have surely violated the Federal Rules of Evidence's hearsay rule if introduced at the guilt phase of trial. <u>Fell</u>, 217 F. Supp. 2d at 485. However, this testimony also violates the Confrontation Clause of the Sixth Amendment and Due Process Clause of the Fifth Amendment. Even absent Fed. R. Evid. 801, this testimony would be inadmissible based solely on the Constitution. The language of § 3593(c) would have allowed Judge Sessions to exclude this prejudicial testimony. Thus, the absence of tangible rules articulating a defendant's constitutional rights to confrontation, cross-examination and, ultimately, a fair trial, are not required for such rights to exist. The Constitution affords Mikos these rights, and the FDPA is constitutional so long as it does not explicitly strip a capital defendant of those rights.

The *Matthews* court held that the FDPA's evidentiary scheme "expressly provides the trial court with the discretion necessary to exclude unreliable and/or prejudicial evidence the admission of which would be fundamentally unfair and, therefore, violate the defendant's right to a fair trial under the Bill of Rights." <u>Id.</u> at 145 (citing <u>United States v. Castillo</u>, 140 F.3d 874, 883 (10th Cir. 1998); <u>Lentz</u>, 225 F. Supp. 2d at 683-84; <u>Frank</u>, 8 F. Supp. 2d at 267-69; <u>McVeigh</u>, 944 F. Supp. at 1487)). In fact, § 3593(c) is broader in scope than Rule 403, the analogous exclusionary provision under the Federal Rules of Evidence. While both provisions balance the probative value of evidence against its prejudicial effect, Rule 403 allows a trial judge to exclude evidence only if it is its probative value is *substantially* outweighed by its prejudicial effect whereas § 3593(c) permits exclusion of evidence whenever its prejudicial effect outweighs its probative

23

value. Under both provisions, the judge, as gatekeeper, has the ability to exclude any evidence from trial that he deems overly prejudicial, confusing, or misleading. Thus, the FDPA enables a judge to act in compliance with the constitutional constraints of the Fifth and Sixth Amendments. The evidentiary provisions of the FDPA "should result in the exclusion of evidence that would violate the accused's right to a fair trial." Matthews, 246 F. Supp. 2d at 146. For this reason, Mikos's facial challenge to the FDPA must be rejected. Of course, if in a particular situation a judge allows for the introduction of evidence that, with or without application of the rules of evidence, violates fundamental conceptions of justice, a claim might be raised that his rights were violated. Out of an abundance of caution, in order to protect against such a situation, this court will apply the Federal Rules of Evidence if this case proceeds to the sentencing phase of trial.

With the exception of *Fell*, all federal courts to entertain the issue of § 3593's constitutionality have upheld it. *See* Matthews, 246 F. Supp. 2d at 146; United States v. Allen, 247 F.3d at 759-60; United States v. Regan, 221 F. Supp. 2d at 681-83; United States v. Minerd, 176 F. Supp. 2d 424, 434-36 (W.D. Pa. 2001); United States v. Frank, 8 F. Supp. 2d 253, 268 (S.D.N.Y 1998); United States v. Nguyen, 928 F. Supp. 1525, 1546-47 (D. Kan. 1996); United States v. Pitera, 795 F. Supp. 546, 565 (E.D.N.Y 1992); United States v. Llera Plaza, 179 F. Supp. 2d at 452-53.

## C. Mikos's Continued Exoneration Motion

Mikos further contends that the FDPA violates the Fifth and Eighth Amendments of the Constitution by depriving him of the continued opportunity for exoneration during his lifetime. (Def.'s Mot. Declare FDPA Unconstitutional, to Strike Special Findings

Superseding Indictment & to Dismiss Notice Intent to Seek Sentence Death Because

Execution Denies Continued Opportunity Exoneration Violation Fifth & Eighth

Amendments ("Def.'s Exoneration Mot.") at 2.) In support of his motion, Mikos attaches

United States v. Quinones, 196 F. Supp. 2d 416 ("*Quinones I*") and United States v.

Quinones, 205 F. Supp. 2d 256 (S.D.N.Y 2002) ("*Quinones II*"), recent opinions of Judge

Jed S. Rakoff for the United States District Court for the Southern District of New York.

Mikos acknowledges that the United States Court of Appeals for the Second Circuit

reversed Judge Rakoff's decision, United States v. Quinones, 313 F.3d 49, 70 (2nd Cir.

2002), but nevertheless adopts the arguments and reasoning set forth by the district court,

contending that the execution of a defendant denies him the continued opportunity for

exoneration during his lifetime based on a claim of innocence and is "tantamount to

foreseeable, state-sponsored murder of innocent human beings." (Def.'s Exoneration

Mot. at 2.) For the reasons that follow, the Court finds that a person convicted of a crime

has no fundamental right to the continued opportunity for exoneration over the course of

his life. Hence, Mikos's motion advocating for such a right is denied.

In *Quinones I*, Judge Rakoff issued a preliminary order on April 25, 2002,

announcing his tentative decision to find the FDPA unconstitutional in light of recent

evidence indicating that innocent people are being wrongly convicted, under the FDPA,

of crimes they did not commit[4] and provided the government with an opportunity to be

---

[4]Judge Rakoff relied primarily upon the emergence of recent results in post-conviction testing with deoxyribonucleic acid, or DNA. Quinones, 196 F. Supp. 2d at 417-18. The statistical evidence was derived in great part from the Death Penalty Information Center's website, http://www.deathpenaltyinfo.org. In addition, he considered the first comprehensive study of American capital appeals, James S. Liebman, et al., *A Broken System: Error Rates in Capital Cases* (2000). However, these studies were not directed toward the federal statutory

heard before he reached a final determination. 196 F. Supp. 2d at 420. On July 1, 2002,

after considering both parties' briefs, Judge Rakoff confirmed his initial view of the

FDPA and declared it unconstitutional. 205 F. Supp. 2d 256. In so ruling, Judge Rakoff

stated,

> It is . . . fully foreseeable that in enforcing the death penalty a meaningful
> number of innocent people will be executed who otherwise would eventually
> be able to prove their innocence. It follows that implementation of [the
> FDPA] not only deprives innocent people of their innocence, and thereby
> violates procedural due process, but also creates an undue risk of executing
> innocent people, and thereby violates substantive due process.

Id. at 257. Judge Rakoff further stated,

> If protection of innocent people from state-sponsored execution is a protected
> liberty, and if such protected liberty includes the right of an innocent person
> not to be deprived, by execution, of the opportunity to demonstrate his
> innocence, then Congress may not override such liberty absent a far more
> clear and compelling need than any presented here.

*Quinones II* acknowledged the government's reliance on *Herrera v. Collins*, 506 U.S.

407 (1993), but determined that its holding was narrow, dealing only with the necessary

showing of innocence a belated or successive habeas petitioner must display to warrant

habeas relief. Judge Rakoff determined that *Herrera* did not preclude him from holding

that the FDPA violates due process because the majority assumed that "in a capital case a

truly persuasive demonstration of 'actual innocence' made after trial would render the

execution of a defendant unconstitutional." 205 F. Supp. 2d at 262. Thus, Judge Rakoff

had found a majority of Justices in *Herrera* concluded that "executing the innocent is

forbidden by the Constitution . . . ." Id. at 263. This holding, Rakoff argued,

> Casts the most serious doubt on the . . . claim that Congress, in the

---

scheme or any situation involving the FDPA.

exercise of its legislative prerogatives, could constitutionally decide to knowingly execute a foreseeable class of mistakenly convicted but actually innocent persons in the belief that their deaths were outweighed by the potential deterring of the murders of other innocent persons.

Id. In *Quinones*, the defendants presented several DNA test results that displayed the disturbing reality of mistakenly convicted capital defendants; this further influenced Rakoff's decision to hold the FDPA in violation of the Fifth and Eighth Amendments. While *Herrera* allowed for the continued use of the death penalty even with the inherent fallibility of the judicial system, Rakoff argued that such a finding is no longer sufficient in light of the "ground-breaking DNA testing and other exonerative evidence developed in the years since." Id. This evidence, Rakoff continued, casts significant doubt on the Court's reliance upon the "high degree of confidence in [our society's] criminal trials . . . ." Id. (citing Herrera, 506 U.S. at 420). Mikos relies solely on the arguments set forth by Judge Rakoff in *Quinones I* and *II*. Because this court respectfully disagrees with the arguments set forth by the district court in *Quinones I* and *II*, it must consequently deny Mikos motion to declare the FDPA unconstitutional on the ground that it denies a defendant the continued opportunity for exoneration in violation of the Fifth and Eighth Amendments.

In review of the district court's opinion, the Second Circuit highlighted the Fifth Amendment's recognition of capital punishment functioning within the confines of the Constitution. Quinones, 313 F.3d at 55 ("[T]he Due Process Clause itself mandates that no person 'be deprived of *life*, liberty, or property without due process of law.'") (quoting U.S. CONST. AMEND. V). In addition, historical practice shows that "a majority of states as well as the federal government have provided for capital punishment for over two

hundred years." Quinones, 313 F.3d at 62. Contrary to Judge Rakoff's assertion in

*Quinones I* and *II*, the contention that innocent persons might be executed under a death

penalty statute is as old as capital punishment itself.[5] The Second Circuit cited several

scholarly works, which bolster the proposition that the inherent risk of an innocent

person being sentenced to death has spawned centuries of debate over whether capital

punishment should be abolished altogether. Quinones, 313 F.3d at 63-64 (citing Hugo

Adam Bedau & Michael L. Radelet, *Miscarriages of Justice in Potentially Capital Cases*,

40 STAN. L. REV. 21, 22 (1987); Jeremy Bentham, *The Rationale of Punishment* (Robert

Heward ed., 1830); Edwin M. Borchard, *Convicting the Innocent: Errors of Criminal

Justice*, Intro. (1932); E. Roy Calvert, *Capital Punishment in the Twentieth Century*, 123-

34 (5th ed. Patterson Smith 1973); and Jerome and Barbara Frank, *Not Guilty* 248-49

(1957)). Amid this backdrop of heated discord, state and federal legislators continued to

enact death penalty statutes, and the United States Supreme Court repeatedly upheld their

constitutionality. Quinones, 313 F.3d at 65 (citing Wilkerson v. Utah, 99 U.S. 130

(1878); In re Kemmler, 136 U.S. 436 (1890); and Louisiana *ex rel* Francis v. Resweber,

329 U.S. 459 (1947)).

In three specific instances over the past thirty years, the United States Supreme

Court has entertained and rejected the argument that capital punishment is

unconstitutional because it denies a defendant the continued opportunity to prove his

---

[5]The Second Circuit provides an extremely detailed history concerning the debate over
the use of capital punishment and its potential implications on the lives of innocent persons.
Quinones, 313 F.3d at 63-65. This historical recap encompasses a discussion of the death
penalty's uses and abuses both prior to the founding of our nation and through the Supreme
Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972).

innocence. First, in *Furman*, the Court acknowledged the risk of capital punishment depriving innocent persons of the ability to exonerate themselves, but declined the opportunity to declare it unconstitutional based on this *mere possibility*. 408 U.S. 238, 247, 290 (1972) (Douglas, Brennan, JJ., concurring). As the Second Circuit in *Quinones* indicated, only two Justices in *Furman* were willing to declare the death penalty a *per se* violation of the Constitution. 313 F.3d at 65 (citing Furman, 408 U.S. at 305). Further, only Justice Thurgood Marshall believed that the possibility of executing an innocent person was sufficient on its own to render the death penalty unconstitutional. Id. In *Gregg*, the Supreme Court expressly upheld the constitutionality of capital punishment while faced with the reality that death, in its finality, relinquishes a defendant of the opportunity to prove his innocence over the course of his life. 428 U.S. at 207. Most recently, in *Herrera,* the Supreme Court specifically held that the death penalty is not *per se* unconstitutional while again recognizing the fact that innocent individuals *might* be executed under the inherent fallibility of any system of justice. 506 U.S. 390, 416-20 (1993).

In lieu of the overwhelming weight of authority before the Court, Mikos asks it to find the FDPA unconstitutional in accordance with *Quinones I* and *II*. However, this Court cannot ignore the Supreme Court's express denial of a defendant's right to continued exoneration. Furthermore, the Court finds Judge Rakoff's interpretation of *Herrera* misguided and incorrect. Judge Rakoff transformed the Supreme Court's mere *dicta* into its majority holding. Justice Rehnquist's statement that a "truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional," Herrera 506 U.S. at 417, and Justice O'Connor's statement

29

that "the execution of a factually and legally innocent person would be a constitutionally intolerable event," id. at 420, does not generate a broader holding by the majority that every individual has a fundamental right to the opportunity for exoneration over the course of one's natural life. While Judge Rakoff is correct in his assertion that a majority of the Justices in *Herrera* concluded that killing an innocent person is forbidden by the Constitution, Quinones, 205 F. Supp. 2d at 263, he failed to decipher the Court's precise definition of innocence. From the Supreme Court's decision in *Herrera*, the court infers that the execution of a defendant is unconstitutional only if he is both factually innocent *and* legally innocent. A showing of legal innocence requires either that a defendant be found "not guilty" at trial, or that subsequent to his conviction, he successfully rebuts the resulting presumption of his guilt.

*Herrera* apparently utilized several presumptions of guilt and innocence in upholding the constitutionality of capital punishment. First, a criminal defendant is presumed innocent until proven guilty-this of course is one of the most well-rooted principles in our criminal justice system. As Justice O'Connor explains in her concurrence, "[T]he trial is the paramount event for determining the guilt or innocence of the defendant." 506 U.S. at 419 (O'Connor, Kennedy, JJ., concurring) (internal citations omitted). During trial, a defendant is provided with the "full panoply of protections that our Constitution affords criminal defendants." Id. However, upon the jury's return of a guilty verdict, the presumption of innocence is replaced by a new presumption-that of guilt. In the eyes of the law, a man convicted by his peers is assumed to be guilty. Id. at 399-400. While a factually innocent person is intermittently convicted of a crime he did not commit, "our society has a high degree of confidence in its criminal trials, in no small

part because the Constitution offers unparalleled protections against convicting the innocent." Id. at 420. Both the *Herrera* majority and Justice O'Connor's concurrence assumed the rebuttable presumption of a convicted defendant's "legal guilt"-a defendant convicted of a crime and sentenced to death has the right to rebut the presumption of his guilt, but will only succeed in disproving his culpability through a persuasive showing of factual innocence. Herrera, 506 U.S. at 405-05 and 426-27. Hence, a defendant who is unable to rebut the presumption of his legal guilt, for all intents and purposes, is "not innocent in the eyes of the law." 506 U.S. at 419 (O'Connor, J., concurring). While the Court acknowledged that the execution of an innocent person would be intolerable, its definition of innocence ultimately requires the existence of one of two specific circumstances: 1) the individual is judged "not guilty" at trial, or 2) the individual is found guilty at trial and later rebuts the presumption of his guilt with a "colorable showing of his factual innocence." Id. at 404. Indeed, the words of Justice O'Connor relied upon by Judge Rakoff in *Quinones II*, support this conclusion: "[T]he execution of a *legally and factually* innocent person would be a constitutionally intolerable event." Herrera, 506 U.S. at 420 (O'Connor, J., concurring) (emphasis added). A convicted defendant is therefore presumed *legally* guilty until proven innocent. While it might seem callous to interpret Supreme Court precedent as allowing for the execution of a factually innocent person simply because he fails to disprove the trial court's finding of guilt, the Supreme Court requires this conclusion.

Judge Rakoff believes that recent scientific developments, DNA testing in particular, undermine the efficacy of the Court's assertion in *Herrera* that the trial is the paramount event for determining the guilt or innocence of the defendant. This court

31

disagrees. The recent results from DNA research demonstrate what society already knows-our system of justice is imperfect. However, the Supreme Court has acknowledged this imperfection and continued to allow for the imposition of capital punishment. Therefore, this court finds the statistics proffered from DNA research inadequate to require a departure from Supreme Court precedent. On the contrary, the emergence of scientific methods that prove the factual innocence of convicted defendants only diminishes the risk of a factually innocent person being convicted of a capital crime and sentenced to death. The court views these scientific advancements as added safeguards that benefit criminal defendants by decreasing the likelihood that our system of justice convicts an innocent person.

"[I]n the eyes of the law, petitioner does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law," and can therefore be executed in a manner consistent with the Constitution. 506 U.S. at 399-400. Therefore, and in accord with _Herrera_, a claim of actual innocence subsequent to a finding of guilt at trial is not in itself a constitutional claim. Id. at 417. Hence, the court agrees with the Second Circuit's assertion that the Supreme Court "declines to adopt the argument that capital punishment unconstitutionally deprives innocent persons who have been sentenced to death of the opportunity to exonerate themselves," and in the process "effectively denie[s] the existence of a fundamental right to the opportunity for exoneration over the course of one's natural life." Quinones, 313 F.3d at 65-67. Mikos's motion is therefore denied.

## D. Mikos's Cruel and Unusual Punishment Motion

Mikos also challenges the constitutionality of the FDPA on the ground that under all circumstances it constitutes cruel and unusual punishment. (Def.'s Mot. to Declare FDPA Unconstitutional, to Strike Special Findings Superseding Indictment & to Dismiss Notice of Intent to Seek Sentence Death Because Death Penalty is Under All Circumstances Cruel & Unusual Punishment & Violates United States Constitution ("Def.'s Eighth Amendment Mot.") at 2.) Mikos has filed several motions attacking the constitutionality of the FDPA in an effort to avoid a punishment of death. However, this particular request is in direct conflict with United States Supreme Court precedent and consequently lacks any merit. The United States Supreme Court has held that the death penalty is not a *per se* constitutional violation. Gregg v. Georgia, 428 U.S. 153 (1976). In extensive detail, the *Gregg* Court described capital punishment as an essential tool used by society to express its moral outrage with extremely offensive conduct. Id. The Supreme Court has affirmed its position time and again. *See* United States v. Jones, 527 U.S. 373, 381 (1999); McClesky v. Kemp, 481 U.S. 279, 296-97, 307 n.28 (1987); and Roberts v. Louisiana, 428 U.S. 325, 331 (1976). In addition, several district and appellate courts have followed the Supreme Court's guidance, including: United States v. Llera Plaza, 179 F. Supp. 2d 444 (E.D. Va. 2002); United States v. bin Laden, 126 F. Supp. 2d 290 (S.D.N.Y. 2001); United States v. Battle, 173 F.3d 1343 (11th Cir. 1999); United States v. Nguyen, 155 F.3d 1219 (10th Cir. 1998); United States v. Battle, 979 F. Supp. 1442 (N.D. Ga. 1997); United States v. Chanthadara, 928 F. Supp. 1055 (D. Kan. 1996); and United States v. McVeigh, 944 F. Supp. 1478 (D. Colo. 1996). It is indeed true that "[c]apital punishment as the penalty for the commission of certain federal

crimes is as old as the nation itself." Fell, 217 F. Supp. 2d at 474. Consequently, Mikos's attack of the federal death penalty as *per se* unconstitutional is summarily rejected.

### E. Mikos's "Incomprehensible to Juries" Motion

Mikos next argues that the FDPA is so incomprehensible to juries that it violates the Fifth, Sixth and Eighth Amendments. Specifically, Mikos alleges that the abstract concepts of statutory and non-statutory aggravating factors are misunderstood by juries and have caused random, arbitrary and discriminatory results. (Def.'s Mot. to Declare FDPA Unconstitutional, to Strike Special Findings Superseding Indictment, & to Dismiss Notice Intent to Seek Sentence Death Because FDPA Is So Incomprehensible to Juries that It Violates the Fifth, Sixth, & Eighth Amendments ("Def.'s Incomprehensibility Mot.") at 13.) In support of his motion, Mikos directs this court's attention to Simmons v. South Carolina, 512 U.S. 154 (1994) (plurality op.), a case in which the U. S. Supreme Court found a state trial court had violated the Due Process Clause of the Fourteenth Amendment when it refused to instruct a jury in the penalty phase of a capital case that South Carolina law precludes the defendant's eligibility for parole. In a plurality opinion, the *Simmons* Court held that due process prohibits a statutory scheme, or an instruction based thereon, which is so incomprehensible that it deprives the factfinder of the ability to make a reasoned and informed choice between a death sentence and a life sentence without possibility of parole. Id. Even if Mikos is correct in his assertion that a jury must be able comprehend the statutory scheme it is asked to find a defendant in violation of, the evidence presented fails to persuade the court that the FDPA is so

34

incomprehensible to juries that it violates the Constitution.

There is no justification prior to trial for this court to hold that the sentencing jury will be unable to comprehend the provisions of the FDPA or the instructions provided by court or counsel. The government relies on *Marshall v. Lonberger*, which held that the crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge." 459 U.S. 422, 438 n. 6 (1983) (quoting Parker v. Randolph, 442 U.S. 62, 73 (1979)). Further, the government cites *Boyde v. California*, which stated that jury instructions in a capital case alleged to be confusing are only constitutionally defective if there is a "reasonable likelihood" that they misled the jury into sentencing a defendant to death. 494 U.S. 370, 380 (1990). Absent evidence to the contrary, the provisions of the FDPA are not reasonably likely to mislead the jury as required by the *Boyde* Court.

Mikos argues that current penalty-phase law is based on the assumption that jurors are capable of understanding sometimes seemingly incomprehensible legal concepts. He attempts to rebut this presumption through a presentation of several empirical studies suggesting that juries find the concepts of aggravating and mitigating facts neither immediately intuitive nor easily clarified though jury instructions.[6]  He argues that the government's assumption is "at war with presumably reliable statistics"

---

[6]Mikos discusses several statistical studies concerning the death penalty, including: William J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 IND. L. J. 1043 (1995); William J. Bowers, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 TEXAS L. REV. 605 (1999); C. Haney, L. Sontag, & S. Costanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 JOURNAL OF SOCIAL ISSUES 149 (1994); C. Haney & M. Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, 18 LAW AND HUMAN BEHAVIOR 411 (1994).

and consequently asks this court to reject it. (Def.'s Incomprehensibility Mot. at 9 (quoting United States v. Armstrong, 517 U.S. 456, 469-70 (1996)).) While these studies are likely to invoke debate, they concentrate on state penalty schemes, rather than the FDPA or instructions given in federal capital trials and are therefore unconvincing. These same studies were considered in *Llera Plaza*, 179 F. Supp. 2d at 444, and the District Court for the Eastern District of Pennsylvania held:

> The studies do not establish that the concepts of aggravating and mitigating factors as used in the FDPA bear such a degree of intrinsic "incomprehensibility" as to render them incapable of clarification through adequate jury instructions such as those to be crafted in the instant case, if a sentencing hearing is required.

Id. at 450 n.5. Mikos only cites one federal opinion, *United States ex. rel. Free v. Peters*, 806 F. Supp. 705, 732 (N.D. Ill. 1992), where a court granted relief based on the presentation of empirical studies displaying a reasonable likelihood of jury miscomprehension of capital sentencing instructions. (Def.'s Incomprehensibility Mot. at 9.) However, this case dealt not with the FDPA, but with the Illinois death penalty statute. Furthermore, the district court's holding was overturned by the Seventh Circuit. Free v. Peters, 12 F.3d 700, 706-07 (7th Cir. 1993). Other district courts have rejected the argument presented by Mikos on similar grounds. *See* United States v. Regan, 228 F. Supp. 2d 742 (E.D. Va. 2002); Llera Plaza, 179 F. Supp. 2d at 450. United States v. Kee, No. S1 98: CR 778 (DLC), 2000 WL 863119 (S.D.N.Y., June 27, 2000). This court agrees with the analysis set forth in these cases and therefore finds the inferences drawn from these studies toward federal capital trials are uncertain, let alone reliable.

Mikos analogizes the FDPA with state sentencing schemes criticized by the Ninth Circuit. In Hamilton v. Vasquez, 17 F.3d 1149, 1159-60 (9th Cir. 1994), the Ninth

Circuit held that a modified commutation instruction made it impossible for a defendant to make a reasoned and informed choice between life and death without the possibility of parole. *See also* McLain v. Calderon, 134 F.3d 1383, 1385 (9th Cir. 1998) (reversing death verdict on similar grounds). Mikos also references *Gallego v. McDaniel*, 124 F.3d 1065, 1074-76 (9th Cir. 1997), where the court found that a defendant was denied his Eighth Amendment right to a fair penalty trial because a misleading jury instruction suggested that he was eligible for parole when parole was actually prohibited under state law. In *McDowell v. Calderon*, 130 F.3d 833, 836-38 (9th Cir. 1997), the Ninth Circuit found reversible error when a jury requested further guidance during the penalty phase of deliberations and the trial court merely referred the jury to a mitigation catchall provision that it was initially given. As the government correctly asserts, however, these cases are based upon state sentencing schemes, most particularly California, that significantly differ from the FDPA. Furthermore, these cases do not focus on the broad proposition of schematic incomprehensibility advanced by Mikos, but rather they focus on claims of error in specific jury instructions given in response to questions from the jury. These cases go beyond consideration of intrinsically incomprehensible sentencing provisions and enter the realm of uncorrected confusion over vague and abstract legal concepts. While uncorrected jury confusion might trigger a substantial constitutional violation, the court is not faced with this issue on this motion. Thus, the cases discussed by Mikos present arguments that are not ripe for adjudication and will only be ripe if and when it can be alleged that the instructions given to the sentencing jury were reasonably likely to mislead the jurors into sentencing Mikos to death.

As noted above, a jury's consideration of a facially vague aggravating factor can

37

be cured either by a limiting instruction from the court or by appellate review. <u>Lambrix</u> <u>v. Singletary</u>, 520 U.S. 518, 530-31 (1997). Even if Mikos is correct in his assertion that the average American juror does not instantaneously understand the act of balancing mitigating and aggravating factors set forth within the FDPA, these abstract concepts have the benefit of being explained in concrete and precise terms through the use of careful jury instructions. Indeed, several abstract legislative concepts require some level of explanation to people who have not endured several years of extensive legal education. Courts have invalidated such facially vague aggravating factors where sentencing instructions "gave the jury no guidance concerning the meaning of any of [its] terms." <u>Godfrey v. Georgia</u>, 446 U.S. 420, 429 (1980). While the statutory aggravating factors drafted by Congress are reasonably clear, the use of jury instructions helps diminish any confusion over any less precise provisions of § 3592 that may exist. If the case before this court proceeds to the sentencing phase of trial, this court will ensure that defense counsel and counsel for the government will have an opportunity to formulate instructions that will frame the jury's deliberations. The court finds persuasive a statement from the District Court for the Eastern District of Pennsylvania in *United States v. Llera Plaza,* 179 F. Supp. 2d 444, 450 (E.D. Pa. 2001), that "[t]here is no reason to believe that the jury will find the collaborative handiwork of court and counsel to be incomprehensible." For the foregoing reasons, this motion is denied.

## F. Mikos's "Failure to Narrow Class of Eligible Persons" Motion

Mikos further argues that the FDPA, on its face and read as a whole, fails to narrow the class of persons eligible for the death penalty from the entire category of

persons convicted of crimes involving "intentional" killings, and therefore the statute stands in violation of the Eighth Amendment. (Def.'s Mot. to Declare FDPA Unconstitutional, Strike Special Findings Superseding Indictment, & Dismiss Notice Intent to Seek Sentence Death because FDPA Fails to Narrow Class Persons Eligible Death Penalty Violation Eighth Amendment ("Def.'s Narrowing Mot."), at 2.) Specifically, Mikos asserts that the mental state provisions of § 3591(a) and certain statutory aggravating factors listed in § 3592(c)[7] provide the jury with too much discretion in sentencing a criminal to death, and practically no meaningful basis exists for distinguishing between the few cases in which the death penalty is appropriate and the many cases in which it is not. (Def.'s Narrowing Mot., at 3.)

Mikos properly depicts the principle established by the U. S. Supreme Court over twenty years ago that a proper capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877 (1983). This precept stems from the Eighth Amendment's demand that a sentencing body not impose a penalty of death in an arbitrary or capricious manner. Furman v. Georgia, 408 U.S. 238 (1972). Further, in order to "survive a challenge of unconstitutional vagueness, a narrowing factor must operate as an 'inherent restraint on the arbitrary and capricious infliction of the death

---

[7]The two provisions of § 3592(c) Mikos references are: § 3592(c)(1) Death during the commission of another crime – The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of [a list of enumerated felonies]; and § 3592(c)(9) Substantial planning and premeditation – The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

sentence.'" Llera Plaza, 179 F. Supp. 2d at 451 (quoting Godfrey v. Georgia, 446 U.S.

420, 428-29). The question before this court is whether the provisions of the FDPA

designed to limit the imposition of the death penalty successfully distinguish the culpable

from the "mega-culpable," or whether they allow for an arbitrary and capricious

designation of death. The court finds the statute effectively narrows the class of persons

eligible for the death penalty and consequently denies Mikos's motion to declare the

FDPA unconstitutional on this ground.

The Supreme Court has held that aggravating factors serving as a predicate for the

death penalty must "not apply to every defendant convicted of murder." Tuilaepa v.

California, 512 U.S. 967, 975 (1994). To comply with this demand, the FDPA requires

two additional elements to be met before a defendant becomes death-eligible. First, §

3591(a)(2)(A)-(D) require the jury to find that a defendant acted with one of four

culpable mental states. Second, the jury must unanimously find the presence of at least

one aggravating factor listed in § 3592(c). Mikos argues that neither requirement

sufficiently clears the constitutional hurdle defined by the Supreme Court.

First, Mikos describes the mental state elements set forth in § 3591(a)(2) as a

congressional attempt to comply with the Eighth Amendment's challenges to the statute.

(Def.'s Narrowing Mot. at 3.) In support of this argument, he cites *Enmund v. Florida*,

458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987). However, these

references are merely empty citations absent any explanation as to their relevance to this

particular matter. For guidance, the court turns to *United States v. Cooper*, 91 F. Supp.

2d 90 (D.D.C. 2000), a case in which this same argument was previously raised. The

district court in *Cooper* understood *Enmund* as primarily holding that the Eighth

40

Amendment prohibits punishing persons who "[themselves] kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" in a similar manner as persons who unintentionally cause harm. Cooper, 91 F. Supp. 2d at 96 (citing Enmund, 458 U.S. at 797-98). Further, *Tison* held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." Id. (citing Tison, 481 U.S. at 158). The defendant in *Cooper* argued that the mental culpability provisions of the FDPA simply repeated "what the Constitution, as interpreted in *Enmund* and *Tison*," already required. Cooper, 91 F. Supp. 2d at 96. The *Cooper* court rejected this contention, finding that not all murders as defined in § 1111(a), the murder statute defendant was charged with committing, meet the minimum "reckless disregard for human life" standard required under § 3591(a)(2)(D) to be punishable by death.[8] This court finds the same to be true under § 1512(a)(1)(A), (which defines that crime of killing a federal witness to prevent his/her testimony before a grand jury) the statute Mikos is charged with committing. Thus, this court finds the arguments of *Cooper* convincing and adopts them in this case.

Mikos further argues that the sixteen aggravating-factor provisions under § 3592(c) of the FDPA, when read as a whole, fail to constitutionally narrow the class of persons eligible for the death penalty. (Def.'s Narrowing Mot. at 2.) In support of this

---

[8]The court found that many felony-murder crimes under 18 U.S.C. § 1111(a) fell short of this standard, which relieved several murder defendants from the potential imposition of the death penalty. The provision states that the defendant must have "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants of the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2)(D).

argument, Mikos cites past federal prosecutor Rory Little's article, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 FORD. URB. L.J. 347 (1999) (hereinafter "*Little*"), which says, "When the generality of these statutory aggravating factors and their commonality in many murders are considered together with the added authority to invoke non-statutory aggravators, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense." Id. at 402. However, further reference to Little's study undermines the theoretical grounds of this assumption. In practice, only 135 out of 418 potential federal capital defendants reviewed by the attorney general from 1990 through 1998 were approved for capital case prosecution. (*See* Def.'s Incomprehensibility Mot. at 11 (citing *Little*, 26 FORD. URB. L.J. at 430).) Of these 135 defendants, only twenty have actually been sentenced to death. *Id.* As the government highlights, these statistics conflict with Mikos's assertion that the FDPA fails to constitutionally narrow the class of death-eligible persons. On the contrary, these figures display the beneficial effects of a balancing statute, such as the FDPA. A defendant convicted of murder at the guilt stage of trial can only be eligible for death after careful consideration by the jury of his mental state and the aggravating factors surrounding the crime. Consideration of these factors must result in the unanimous finding of their presence by a jury. The balancing of these factors along with the unfettered introduction of non-statutory aggravators and mitigating circumstances provides a defendant with all of the constitutional safeguards currently required by the Supreme Court. This court agrees with the holding of Llera Plaza that "it is not the case that a person of ordinary sensibility could fairly characterize almost every murder" as meeting the criteria of felony murder or substantial planning and

premeditation factors within the FDPA. 179 F. Supp. 2d at 452 (quoting <u>Godfrey v. Georgia</u>, 446 U.S. at 428-29).

This court holds that the FDPA has successfully narrowed the class of persons eligible for the imposition of the death penalty. This decision finds itself in the company of several courts that have encountered and rejected the same arguments made before us today. *See* <u>United States v. Allen</u>, 247 F.3d 741, 761 (8th Cir. 2001); <u>United States v. Flores</u>, 63 F.3d 1342, 1374 (5th Cir. 1995); <u>United States v. Minerd</u>, 176 F. Supp.2d 424,433 (W.D. Pa. 2001); <u>Smith v. Anderson</u>, 104 F. Supp. 2d 773, 346 (S.D. Ohio 2000); <u>Cooper</u>, 91 F. Supp. 2d at 96; <u>Nguyen</u>, 928 F. Supp. at 1539; <u>Llera Plaza</u>, 179 F. Supp. 2d at 452. Consequently, Mikos's motion is denied.


## G. Mikos's "Non-Statutory Aggravating Factor" Motion

### 1. Limiting and Guiding the Discretion of the Jury

Mikos initially attacks the FDPA provisions concerning non-statutory aggravating factors on the grounds that it authorizes "the government to unilaterally expand the list of aggravating factors on a case-by-case basis [which] would inject into capital proceedings the uncertainty and disparate case results that *Furman* found to violate the Eighth Amendment." (Def.'s Mot. to Declare FDPA Unconstitutional, to Strike Special Findings Superseding Indictment & to Dismiss Notice Intent to Seek Sentence Death because Federal Death Penalty Act Provisions Regarding Non-Statutory Aggravating Factors Violate U. S. Constitution ("Def.'s Non-Statutory Factor Mot.") at 3.) Specifically, Mikos asserts that the open-ended structure of § 3592(c) provides prosecutors with no guidance in their determination and selection of non-statutory

aggravators and fails to limit the discretion of a sentencing body in determining whether a human life should be taken or spared." (Def.'s Non-Statutory Mot. at 2-3.) The Court finds this argument lacks merit for two reasons. First, non-statutory aggravators are not intended to narrow the class of defendants eligible for the death penalty. Their function is to allow for the introduction of information relevant to the character of the defendant or the circumstances of the crime, thereby individualizing each capital sentence as much as possible. Second, the catchall provision does not provide prosecutors with unfettered discretion over the introduction of non-statutory factors, but rather their discretion is limited by the language of § 3593(c) and the gatekeeping role of the judge.

Mikos directs our attention once again to *Gregg v. Georgia*, a case in which the Supreme Court clearly articulated a fundamental principle of death penalty jurisprudence: "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S. at 189; *see also* McClesky v. Kemp, 481 U.S. 279, 304 (1987) ("Carefully designed standards must narrow a sentencer's discretion."). While the standard set in *Gregg* is well-accepted, this court finds Mikos's reliance upon it misplaced. The constitutional requirement that the class of death-eligible persons must be narrowed so as to avoid arbitrary and capricious sentences of death is accomplished by the implementation of the statutory aggravating factors and mental culpability requirements of § 3592. *See* discussion *supra* Part B. The completely distinct function of non-statutory aggravating factors is to fulfill the need for individualized capital sentencing decisions. As noted in *Spaziano v. Florida*, 468 U.S. 447, 459 (1984), a

44

capital sentencer "has a constitutional obligation to evaluate the unique circumstances of the individual defendant." The government has properly addressed the Supreme Court's holding that "the Constitution allows consideration of non-statutory aggravating factors 'relevant to the character of the defendant or the circumstances of the crime' after the sentencer first finds at least one statutory aggravating factor that narrows the class of defendants eligible for the death penalty." (Gov't's Resp. at 63 (quoting Barclay v. Florida, 463 U.S. 939, 967 (1983)).)

The *Zant v. Stephens* Court considered the constitutional implications of non-statutory aggravators in state capital sentencing schemes and explicitly held that "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting from among [the narrowed class of persons eligible for the death penalty], those defendants who will actually be sentenced to death." 461 U.S. at 878. Several courts have upheld the use of non-statutory aggravating factors as constitutional. *See* Barclay, 463 U.S. at 967; Llera Plaza, 179 F. Supp. 2d at 454; United States v. Cooper, 91 F. Supp. 2d at 100 (D.D.C. 2000); Nguyen, 928 F. Supp. 1532; United States v. Chanthadara, 928 F. Supp. 1055, 1057 (D. Kan. 1996); United States v. Frank, 8 F. Supp. 2d 253, 265 (S.D.N.Y. 1998); United States v. Kaczynski, No. CR-S-96-259GEB GGH, 1997 WL 716487, at *5 (E.D. Cal. 1997). Thus, it appears unequivocal that subsequent to a jury's unanimous finding of a defendant's mental culpability and the presence of at least one statutory aggravating factor, it may consider information in furtherance of aggravation and mitigation in order to accomplish its goal of individualized sentencing.

Additionally, Mikos's contention that the prosecution has unfettered discretion

45

during sentencing to allege any facts it chooses under the guise of a non-statutory aggravating factor is incorrect. This court is charged with the duty under § 3593(c) to exclude the introduction of any evidence where the probative value is likely to be "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Further, as stated in the discussion of the evidentiary standards, *supra* Part B, if this case proceeds to the sentencing phase of trial, both parties can be assured that this court will apply the Federal Rules of Evidence.

### 2. Congress's Delegation to the Government of the Power to Define Aggravating Factors

Mikos further attacks the catchall provision of § 3592(c) as an unconstitutional delegation of legislative power upon the executive branch to define non-statutory aggravating factors. (Def.'s Non-Statutory Mot. at 4.) Article I, § 1 of the Constitution vests the legislative power of the federal government in Congress. However, prosecutorial discretion to promulgate non-statutory aggravating factors falls squarely within the constitutionally permissible range of delegation of power to the Executive Branch. Mistretta v. United States, 488 U.S. 361, 372-73 (1989). *Mistretta* condoned such delegation so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." Id. at 372 (quoting J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928). Courts have considered the question whether the delegation of power to the executive branch in this situation is governed by an intelligible principle and have consistently determined it is. United States v. Jones, 132 F.3d 232, 239-40 (5th Cir.

1998), *aff'd*, 527 U.S. 373 (1999); <u>United States v. Allen</u>, 247 F.3d 741, 758-59 (8th Cir. 2001); <u>United States v. O'Driscoll</u>, 203 F. Supp. 2d 334, 346-47 (M.D. Pa. 2002).

While courts are split as to whether the prosecutorial power to define non-statutory aggravating factors under the FDPA constitutes a delegation of legislative power, the court finds that either conclusion renders the same result concerning the provision's efficacy. If a court determines that prosecutorial discretion to promulgate non-statutory aggravators is a delegation of power by legislative act, such conduct would be considered an appropriate delegation of power as defined by *Mistretta*. As Mikos indicates, this was the case for the Tenth Circuit in *United States v. McCullah*, 76 F.3d 1087, 1006 (10th Cir. 1996), *aff'd on reh'g*, 87 F.3d 1136 (10th Cir. 1996), and the Fourth Circuit in *United States v. Tison*, 90 F.3d 861, 895 (4th Cir. 1996). Conversely, several district courts have determined that such an action is not a delegation of legislative power at all. *See* <u>United States v. Walker</u>, 910 F. Supp. 837, 850-51 (N.D.N.Y. 1995); <u>United States v. Pitera</u>, 795 F. Supp. 546, 560 (E.D.N.Y. 1992); <u>United States v. Bradley</u>, 880 F. Supp. 271 (M.D. Pa. 1994). While the prosecutorial power to define non-statutory aggravators would be an appropriate delegation of power, this court is inclined to agree with those opinions that classify the selection of non-statutory aggravating factors as an act of advocacy, not legislation. Non-statutory aggravating factors are not laws; they are not elements of the offense. They are merely considerations that help individualize the sentencing of each capital trial much the same as they do in noncapital trials. Therefore, this court disagrees with Mikos's assertion that the prosecutorial authority to define non-statutory aggravating factors under the FDPA is an impermissible delegation of legislative authority.

47

### 3. Ex Post Facto Implications

Mikos argues that § 3592 unconstitutionally permits the prosecution to manufacture aggravating circumstances retroactively to the commission of crimes and before the aggravating circumstances are identified. This result, Mikos asserts, violates Article I, § 9, cl. 3 of the U. S. Constitution, which holds that "No . . . ex post facto law shall be passed." (Def.'s Non-Statutory Mot. at 8.)

The Supreme Court has explained that the ex post facto clause is implicated only by "laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" California Dep't of Corr. v. Morales, 514 U.S. 499, 504 (1995) (quoting Collins v. Youngblood, 497 U.S. 37, 41 (1990)). In the context of capital sentencing, non-statutory aggravating factors are square pegs that do not adequately fit into the circular holes provided for by the ex post facto clause. The court agrees with the analysis of *United States v. Llera Plaza*, where the U. S. District Court for the Eastern District of Pennsylvania held, "[Non-statutory aggravating factors] neither 'alter the definition' of the defendant's crime, nor do they 'increase the punishment' for his or her criminal act. Entirely separate statutory provisions establish the possible range of punishments for those crimes." Llera Plaza, 179 F. Supp. 2d at 455-56. Several courts are of the same opinion as *Llera Plaza. See* Allen, 247 F.3d at 759; United States v. Frank, 8 F. Supp. 2d at 267; Pitera, 795 F. Supp. at 564; Minerd, 176 F. Supp. at 433; United States v. Kaczynski, No. CR-S-96-259GEB GGH, 1997 WL 716487, at *6. This court similarly characterizes non-statutory aggravating factors as procedural considerations that do not change the quantum of punishment attached to the crime. In accord with these decisions, the court finds that § 3592 of the FDPA does not violate the ex post facto clause.

### 4. Statutory Inconsistencies

Mikos next directs the court's attention to the language of §§ 3591 and 3592 and contends that, when read together, the two provisions are inconsistent and should preclude the use of non-statutory aggravating factors altogether. (Def.'s Non-Statutory Mot. at 9.) § 3591(a) provides:

> [A defendant found guilty of a death-eligible offense] shall be sentenced to death if, after consideration of the factors set forth in § 3592 in the course of a hearing held pursuant to § 3593, it is determined that imposition of a sentence of death is justified . . . .

§ 3591(a). Simultaneously, § 3592(c) says:

> In determining whether a sentence of death is justified for an offense described in §3591(a)(2), the jury shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:
> [subsections (1)-(16) provide the list of statutory aggravating factors]
> The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

18 U.S.C. § 3592(c). Mikos argues that the catchall provision in § 3592(c) contradicts § 3591's requirement that aggravating factors be set forth in § 3592. This exact argument was considered and rejected in *United States v. Nguyen*, 928 F. Supp. 1525 (D. Kan. 1996), where the district court held, "A statute should be construed, if possible, in such a way that all of its provisions can be given effect, and so that no part of the statute is rendered inoperative or superfluous." Id. at 1536 (citing Homeland Stores, Inc. v. Resolution Trust Corp., 17 F.3d 1269, 1273 (10th Cir.)); *see also* Beck v. Prupis, 529 U.S. 494, 506 (2000) ("Terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous."). The court interpreted Nguyen's reading of the statute as "strained and hyper-literal, [which would] render large portions

of § 3592 inoperative." Nguyen, 928 F. Supp. at 1536.

The canon of statutory construction highlighted in *Nguyen* was recently iterated in *United States v. Llera Plaza*, 179 F. Supp. 2d at 458. In *Llera Plaza*, the district court expanded on *Nguyen* and reasoned as follows:

> Close scrutiny of the FDPA's text reveals that the problem of parsing §§ 3591(a) and 3592(c) is somewhat more complex than . . . the refutation of a cognate argument in *Nguyen* would suggest. To understand the quoted statutory provisions, reference must be made to the entire fabric of the FDPA. Other sections of the FDPA confirm that the phrase "the factors set forth in § 3592," as used in § 3591(a), should be interpreted to include only statutory aggravating factors. . . . § 3591(a) thus affirmatively directs the sentencer to include statutory factors in its calculus; however, it does not prohibit the sentencer from including non-statutory aggravating factors as well-or, for that matter, mitigating factors. Simply because consideration of one type of factor is mandated does not mean that consideration of other types of factors is precluded.

Id. at 458-59 (quoting 18 U.S.C. § 3591(a)). This court finds the analysis set forth in these two cases persuasive. Mikos's argument therefore fails to "present a compelling challenge to the government's authority to articulate non-statutory aggravating factors under the FDPA."

## 5. Proportionality Review

"[P]roportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." Pulley v. Harris, 465 U.S. 37, 43 (1984). Mikos's final attack on the constitutionality of the FDPA is that the statute allows for consideration of non-statutory aggravating factors without also providing for proportionality review. (Def.'s Non-Statutory Mot. at 9.) In making this argument,

Mikos primarily relies on the Supreme Court's 1983 decision in *Zant v. Stephens*, where the Court upheld a Georgia capital sentencing statute partly on the grounds that it provided for "mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality." Id. (quoting Zant, 462 U.S. at 890). Mikos reads *Zant* as standing for the proposition that "proportionality review is a *necessary* check on the arbitrary imposition of a death verdict." (Def.'s Non-Statutory Mot. at 13 (emphasis added).) The court cannot agree with Mikos's interpretation of *Zant* that proportionality review *must* be statutorily prescribed. Proportionality review was merely one factor the *Zant* Court considered in upholding the Georgia statute. The Court called attention not only to the statute's provision requiring mandatory appellate review, but also to the required presence of two valid statutory aggravating factors and consideration of non-statutory aggravating factors. Zant, 462 U.S. at 889-90. The Court found that the amalgamation of these procedural safeguards adequately limited the sentencer's discretion and insured proportionality. Id. at 890. Nowhere in the *Zant* opinion does the Supreme Court require proportionality review by an appellate court in all capital cases where a sentencing body considers non-statutory aggravating factors. In fact, only one year after *Zant*, the Supreme Court held that the Eighth Amendment does not require state appellate courts to engage in proportionality review. Pulley, 465 U.S. at 44. Mikos acknowledges this decree, but argues that *Pulley* does not "define the universe" of proportionality review. (Def.'s Non-Statutory Mot. at 10.) Along the same vein, this court is of the opinion that proportionality review is but a star within the universe of procedural safeguards. "Where the statutory procedures [in a death penalty statute] adequately channel the sentencer's discretion, such proportionality

review is not constitutionally required." <u>McCleskey v. Kemp</u>, 481 U.S. at 306. Congress incorporated several procedural safeguards, discussed in detail throughout this opinion, into the FDPA so as to ensure that a sentencing body's discretion is adequately limited and to eradicate the possibility that a person would be arbitrarily sentenced to death. While proportionality review is a valuable process that can assist in combating arbitrary and capricious death sentences, Congress was under no obligation to include it in its statute. The FDPA, as currently drafted, provides sufficient safeguards to protect against arbitrary and capricious sentencing decisions even absent a provision requiring mandatory proportionality review. As the government points out, the FDPA does provide for appellate review to prevent arbitrary and capricious sentencing and does not preclude an appellate court from engaging in proportionality review if it wishes to. 18 U.S.C. § 3595. Mikos's argument does not, therefore, present a compelling challenge to the FDPA's failure to provide for mandatory proportionality review. *See* <u>Allen</u>, 247 F.3d at 760; <u>Jones</u>, 132 F.3d at 240-41; <u>Frank</u>, 8 F. Supp. 2d at 272-73; <u>Nguyen</u>, 928 F. Supp. at 1537; <u>Cooper</u>, 754 F. Supp. at 626; <u>Llera Plaza</u>, 179 F. Supp. at 456-57.

## CONCLUSION

The provisions within the Federal Death Penalty Act allow for the executive and judicial branches to act in accordance with all of a defendant's constitutional rights. For the foregoing reasons, this court denies Mikos's motions to declare the death penalty unconstitutional [doc. nos. 47-1, 47-2, 47-3, 48-1, 48-2, 48-3, 49-1, 49-2, 49-3, 50-1, 50-2, 50-3, 51-1, 51-2, 51-3, 52-1, 52-2, 52-3, 53-1, 53-2, 53-3].

**SO ORDERED**                    **ENTERED:** *September 9, 2003*


HON. RONALD A. GUZMAN
**United States Judge**