Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 137 - 1 | **DATE** | 7/15/2004 |
| **CASE TITLE** | USA vs. RONALD MIKOS | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Government's motion in limine seeking to admit various hearsay statements made by murder victim is granted and denied in part.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUL 16 2004 | |
| | Notified counsel by telephone. | | date docketed | 204 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| CG | courtroom deputy's initials | 2004 JUL 15 PM 4:53 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | 02 CR 137-1 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| RONALD MIKOS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

DOCKETED
JUL 1 6 2004

The government has filed a motion in limine seeking to admit various hearsay statements made by murder victim, Joyce Brannon, under the wrongdoing exception, or in the alternative, the residual exception. Fed. R. Evid. 804(b)(6), 807. The government wants to introduce statements Brannon made to various individuals concerning a telephone conversation she had with defendant, Ronald Mikos, three days before she was murdered. The government also seeks to introduce statements Brannon made during an investigative interview with Special Agents from the United States Department of Health and Human Services (hereinafter "HHS Agents"). Defendant contends the statements are inadmissible hearsay that do not fall within any exception and also argues the statements should be excluded as more prejudicial than probative under Federal Rule of Evidence 403. The motion is granted in part and denied in part, as discussed below.

## Background

In or around August 2000, the government began a federal grand jury investigation of defendant Mikos, a podiatrist, for Medicare fraud. The investigation focused on several of

1

Mikos' patients, including Joyce Brannon, whom he last treated sometime in 1997. The central allegations were that Mikos billed Medicare for surgeries and services which he never performed, including some 87 surgeries on Brannon. In September 2001, HHS agents interviewed Brannon, who denied having had surgery while under Mikos' care.

On January 9, 2002, Brannon was served with a subpoena requiring her to testify at grand jury proceedings on January 31. Mikos, who was aware of the investigation, allegedly called Brannon on the night of January 24 to convince her not to testify or to fabricate her testimony. According to the government, Brannon informed Mikos that she would testify and that she would tell the truth: that Mikos never performed surgery on her. Phone records allegedly show that the call lasted approximately four minutes. Brannon allegedly discussed this conversation with her sister and friend that evening, and with three other individuals during the next couple of days. On January 27, while Brannon sat in her apartment in the basement of Bethany Evangelical Church, she was shot six times in the back, neck and head at close range.

Mikos was arrested soon thereafter and later charged not only with healthcare fraud, but also with Brannon's murder. The government has moved in limine to admit statements Brannon allegedly made to five individuals regarding the January 24 phone call she received from Mikos. In addition, the government wants to introduce statements Brannon made during the interview with HHS Agents. A summary of the witnesses' potential testimony is set forth below, in chronological order.

### A. Interview with HHS Agents

In September 2001, Brannon was interviewed by HHS Agents. The Agents asked whether Mikos performed some 87 surgeries on her feet for which he had billed Medicare.

Brannon told the Agents she recalled that Mikos trimmed her toenails because she had a bad back and could not take care of her feet. She also recalled having surgery on both big toes, but could not remember if defendant performed those surgeries. According to the Agents, Brannon also said, "no way did he do that many surgeries. He might have scraped a scar or put medicine on my wart, but he did not do that." (Gov't. Mot. at 10.)

**B.     Phone Calls to Brannon's Sister and Individual B**

As mentioned above, Mikos called Brannon on January 24. Their conversation ended around 8:05 p.m. A few minutes later, phone records show that Brannon called her sister. That call lasted only a few seconds and ended in Brannon leaving a message stating, in essence, that she "received a subpoena to testify against a doctor for Medicare fraud and the doctor had called her at home and tried to talk her out of it." (Gov't Mot. at 5.)

Brannon then dialed her friend, Individual B. That call lasted seven seconds. About ten minutes later, Individual B returned Brannon's call and they spoke for about eighteen minutes. Phone records show that Individual B called Brannon back a second time. This conversation lasted for a little more than three minutes, ending around 8:47 p.m. Individual B would testify that their conversation went as follows:

> Brannon said that the podiatrist that she was going to testify against had just called her. Brannon said that the doctor asked her about her interview with the investigators. He wanted to know what questions the investigators had asked Brannon and what she had told them. Brannon said that the doctor wanted her to change her testimony to say she had in fact had the surgeries. Brannon told the doctor she wouldn't lie because she could not prove that she had the surgeries as she had no scars from any surgeries. The doctor told Brannon that this could be explained by saying that the scars were in between the skin folds and were therefore not visible.
>
> Brannon told the doctor she was not going to change her testimony because she was

3

going to tell the truth. The doctor asked her to reconsider because he had small
children to think about and could lose it all. Brannon told the doctor she was going
to go through with her testimony.

(Gov't Mot. at 6-7.)[1]

Phone records show that at around 9:33 p.m., Brannon's sister returned her call and they spoke for about nine minutes. Her sister allegedly would testify that Brannon told her the following:

Brannon had received a subpoena to testify on January 31, 2002 against a doctor who had committed Medicare fraud by putting in false claims using her as a patient. The doctor had put in over twenty claims for surgery on her feet and all he had done was cut her toenails. Brannon told her sister that the doctor had called her at home on January 24 and told her that he just wanted to give her his new telephone number. The doctor then told Brannon that if she testified against him that he would lose his medical license. Brannon told the doctor that she would not lie for him because she would lose her nurse's license. The doctor then told Brannon that her testifying would ruin his family and that he has little children at home. The doctor also told Brannon that she could just tell the authorities that she did not remember anything that happened. Brannon told the doctor that she would not lie because she was an honest person. Brannon then told the doctor that he did not do any of the surgeries on her that he claimed but only cut her toenails and she had no scars on her feet. The doctor then told her that she could say that the scars were in the folds of her skin. Brannon told the doctor she was going to tell the truth and if they wanted she would show the authorities her feet.

(*Id.* at 5-6.)

C. **Visit by Home Healthcare Nurse, Individual C**

The following day, Brannon allegedly had a conversation with her home healthcare nurse, Individual C, during her regular Friday appointment. According to Individual C, Brannon told him that "she was going to give a deposition the following week regarding a foot doctor....and that the doctor had called her the previous night...and wanted to talk about the deposition. Brannon told

---

[1] Individual B also told investigators about a previous conversation with Brannon, during which Brannon told Individual B the investigators asked her "about twenty surgeries to release contractors in her legs. Brannon said she told the investigators she had never had any surgeries done by the doctor, and all he had done was cut her toe nails [sic]." (Gov't Mot. at 7.)

4

Individual C that she told the doctor she was going to go ahead with the deposition." (*Id.* at 8.) According to Individual C, it was unusual for Brannon to mention the conversation because "their typical conversations were small talk, and Brannon did not talk about personal things to him." (*Id.*)

### D. Conversation with Church Volunteer, Individual D

On the afternoon of January 27, 2002, Brannon had a conversation with a church volunteer, Individual D. Brannon said she "would not be at the church on January 31, 2002 because [she] was going to testify in [sic] the grand jury against her former doctor. Brannon told Individual D that the doctor had billed Medicare for a number of operations on her feet when all he did was clip her toenails. Brannon then told Individual D that the doctor had called her several times and pleaded with her not to say anything about his billing practices because it would ruin his career. Brannon told the doctor he would have to face what he had done." (*Id.* at 8-9.) Individual D allegedly was very surprised to hear Brannon talk about her conversation with the doctor as they usually discussed the weather or church-related activities.

### E. Conversation with Friend, Individual E

Finally, Brannon allegedly spoke with a friend, Individual E, several times about defendant. Brannon allegedly said Mikos "begged her not to testify" and told her "she just did not remember the number of operations [he] performed." (*Id.* at 9.) According to Individual E, Brannon responded that "she was an emergency room nurse, and she knew what was done to her." (*Id.*)

## Analysis

### A. The Wrongdoing Exception

The government seeks to admit Brannon's statements under the wrongdoing exception to

the hearsay rule.[2] Under this exception, statements of an unavailable witness are admissible against a party who has "engaged or acquiesced in wrongdoing that was intended to, and did, procure the [declarant's] unavailability." Fed. R. Evid. 804(b)(6). To prevail on this argument, the government must prove by a preponderance of the evidence that Mikos murdered Brannon to prevent her from testifying. *United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002). The government proposes "conditional admission of Joyce Brannon's statements pursuant to a proffer of the evidence it intends to offer establishing that defendant murdered Joyce Brannon." (Gov't Mot. at 3 n.2.) The government informed the Court that the proffer procedure is well established, citing *United States v. Thompson*, 286 F.3d 950, 961 (7th Cir. 2002), and *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991).

In essence, the government would be required to convince the Court by a preponderance of the evidence that Mikos killed Brannon to prevent her from testifying. None of the cases cited by the government persuade the Court that a proffer procedure is an appropriate mechanism for making this determination in this case. For instance, in *United States v. Thompson*, the government sought to admit statements of a murdered informant under the wrongdoing exception. 286 F.3d at 961. The statements pertained to "uncompleted drug transactions, detailed some of the conspiracy's money laundering activities, and put names to faces and owners to vehicles." *Id.* at 962-63. The government's proffer asserted that five defendants participated in the declarant's murder or cover-up to prevent him from providing further information to the authorities. *Id.* at 961. Based on the proffer, the district court admitted the

---

[2] The government contends that Brannon's statements are "admissible under several alternate evidentiary theories," however, it discussed only the wrongdoing and residual exceptions. (Gov't Mot. at 4 n.3.) Therefore, the Court will address only those exceptions.

6

statements under the wrongdoing exception.³ *Id.* On appeal, the Seventh Circuit suggested that the statements were admitted in error, but concluded that any error was harmless. *Id.* It reasoned that the government provided overwhelming evidence of guilt on the drug charges, that the statements pertaining to the drug charges "were not very important to the government's case; and, to the extent the statements were important, they were cumulative." *Id.* at 962 (citation omitted).

In *United States v. Ochoa*, 229 F.3d 631, 638 (7th Cir. 2000), a government witness could not be found when it came time for trial. The government argued that the witness' prior statements to law enforcement officers were admissible under the wrongdoing exception because the defendant helped the witness flee by allowing him to use defendant's phone. *Id.* at 639. The statements were admitted under the wrongdoing exception during the course of the trial.⁴ *Id.* The Seventh Circuit found that the defendant's conduct did not amount to a wrongdoing, but in the end, concluded that even though the statements were admitted in error, the error was harmless. *Id.*

In *United States v. Scott*, 284 F.3d 758, 760-62 (7th Cir. 2002), the court used the wrongdoing exception to admit the grand jury testimony of a witness who refused to testify at trial. The testimony, which confirmed defendant's involvement in various drug transactions, was admitted after the court conducted an evidentiary hearing to determine if the defendant procured

---

³ The jury ultimately acquitted defendants on the murder and cover-up charges. *Id.* at 956.

⁴ The Seventh Circuit ruled that the alternative theories of admission, namely Federal Rules of Evidence 804(b)(3) and 807, also were erroneous. *Ochoa*, 229 F.3d at 638-39. The statements did not contain particularized guarantees of trustworthiness because they were elicited by law enforcement officers. *Id.* at 639.

7

the witness' unavailability by threats and coercion. *Id.* On appeal, the Seventh Circuit characterized the statements as "powerful testimony in a conspiracy case," and ruled that they were properly admitted under the wrongdoing exception. *Id.* at 762, 765.

Finally, *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1990), was a drug prosecution case involving the admissibility of hearsay statements under the co-conspirator exception. The Seventh Circuit stated that the *ex parte* proffer procedure used in *Cox* "gives us pause" and proceeded to lay out approved procedures for making a preliminary admissibility determination for co-conspirator statements, including: (a) ruling based on a pretrial proffer, subject to the court's later determination that, based on all the evidence admitted at trial, the government has proven the foundational elements by a preponderance of the evidence; (b) ruling on each statement as it is elicited based on the evidence adduced to that point; (c) in the absence of a pretrial proffer, conditionally admitting the coconspirator's statements subject to the government's eventual proof of the foundational elements (the penalty for not so proving being a possible mistrial); or (d) holding a "full blown" preliminary hearing. *Id.* at 520, 526 (citing *United States v. Andrus*, 775 F.2d 825, 836-37 (7th Cir. 1985)).

The government suggests that the proffer procedure is appropriate for this case. The defendant did not comment on or object to this procedure, except to argue that the evidence set forth in the government's brief fails to establish that Mikos killed Brannon by a preponderance of the evidence. The Court is unwilling to admit Brannon's statements based on a proffer. It is true that a proffer procedure was used in both *Thompson* and *Ochoa*, but in both of those cases, the evidence was admitted erroneously. In *Scott*, statements were properly admitted, but only after an evidentiary hearing. Further, the procedures set forth in *Cox* were in reference to co-

8

conspirator statements and are not necessarily appropriate in all cases for making a preliminary admissibility decision under the wrongdoing exception.

In addition to being troubled by the proposed procedure for determining admissibility, the Court is concerned by the potential importance of the testimony, the fact that this is a capital case, and the fact that the alleged wrongdoing is one of the crimes to be proven at trial. The Court is aware that the wrongdoing exception was employed in *Thompson*, where the wrongdoing, *i.e.*, the murder of an informant and its cover-up, consisted of crimes to be proven at trial. 286 F.3d at 956. However, *Thompson* is distinguishable because the statements admitted were not important to the government's case, whereas in this case, they are potentially powerful evidence against the defendant. *Id.* at 962. Indeed, Brannon allegedly stated that she intended to testify at the grand jury proceedings that Mikos had never performed surgery on her feet and that he called her to convince her to lie about it. These statements go to the heart of the charges in the indictment: that Mikos is guilty of healthcare fraud and obstruction of justice, and that he had a motive to murder Brannon.

Moreover, to admit these statements, the government would first be required to prove the defendant guilty by a preponderance of the evidence of the very crime charged in the indictment, *i.e.*, Brannon's murder. The testimony could then be used to prove the defendant's guilt again, only this time, before a jury and beyond a reasonable doubt, of the crime charged in the indictment, Brannon's murder. Allowing otherwise inadmissible evidence to prove a defendant's guilt in a capital case based upon a judge's pretrial conclusion that the defendant is in fact guilty of that very crime appears to us to be a slippery slope. The resulting erosion of a defendant's right to a trial of the issues by a jury of his peers could be significant. The relaxation of the rules

of evidence based upon the Court's pretrial determination of the defendant's probable guilt carries with it the very real possibility of someday substantially eroding the defendant's right to be presumed innocent. The rules of trial should not depend upon the Court's pretrial opinion of the defendant's guilt or innocence. This issue is not necessarily encountered when the wrongful conduct which the defendant is accused of in connection with the witness' unavailability is not also the very crime for which he will be tried. But when it is the case, the Court should, at the very least, be extremely reticent to engage in any pretrial procedures that might predetermine the outcome of the case. By relaxing the rules of evidence to allow testimony which would not be admissible absent a pretrial determination of guilt, we come perilously close to a self-fulfilling prophecy. Therefore, this Court declines to decide whether the wrongdoing exception applies based on a pretrial proffer. The government's motion to admit Brannon's statements under the wrongdoing exception is denied.

## B. The *Crawford* Decision

Next, the Court considers whether Brannon's statements to HHS Agents are admissible in light of *Crawford v. Washington*, ---- U.S. ----, 124 S. Ct. 1354, 1374 (2004), which was published after this motion was fully briefed. In *Crawford*, the Court ruled that "testimonial" hearsay statements of an unavailable witness are inadmissible unless there was an opportunity for cross examination. *Id.* The Court did not spell out the definition of "testimonial," but stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 1375. The opinion made clear that formal statements to government officers are considered testimonial, whereas casual remarks to acquaintances are not. *Id.* at 1364.

HHS Agents interviewed Brannon as part of a formal healthcare fraud investigation. Their purpose was to gather information for potential use against Mikos at trial, thus, the Court finds that Brannon's statements to the HHS Agents fall within the realm of testimonial statements. *See United States v. Saner*, 313 F. Supp. 2d 896, 902 (N.D. Ill. 2004) (holding statements made in response to questioning by Department of Justice prosecutor were testimonial). Because Mikos had no opportunity for cross examination, these statements must be excluded.

The remaining statements the government seeks to admit stem from Brannon's conversations with her sister and friends. There was no government involvement in these conversations, therefore they are not testimonial in nature and *Crawford* does not apply. *Saner*, 313 F. Supp. 2d at 900 (stating *Crawford's* holding is limited to testimonial statements).

## C. The Residual Exception

The government argues Brannon's statements to her sister and friends are admissible under the residual exception. Because the residual exception is not a "firmly rooted exception" to the hearsay rule, the statements cannot be constitutionally admitted unless they contain "particularized guarantees of trustworthiness."[5] *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). A trial judge has considerable discretion in determining whether hearsay statements are trustworthy.

---

[5] The Court rejects the defendant's reliance on *In re Denslow*, 104 B.R. 761, 766 (E.D. Va. 1989) (holding that the residual exception cannot be used when the proffered evidence fits under a conventional exception but is excluded for lack of proof). The residual exception is not so narrowly applied within the Seventh Circuit and may be used as an alternate theory of admissibility. *See United States v. Vretta*, 790 F.2d 651, 658 (7th Cir. 1986) (admitting evidence under residual exception instead of state of mind exception); *United States v. Santos*, 65 F. Supp. 2d 802, 823 (N.D. Ill. 1999) (concluding that even if the hearsay in question was inadmissible as a present sense impression, it would come in through the residual exception). Moreover, Brannon's statements were not excluded under the wrongdoing exception for failure of proof.

11

*United States v. Seavoy*, 995 F.2d 1414 (7th Cir. 2000) (citations omitted). The Seventh Circuit has enumerated seven factors to consider in assessing trustworthiness, including: "[1] the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; [2] whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; [3] the witness' relationship with both the defendant and the government and his motivation to testify...; [4] the extent to which the witness' testimony reflects his personal knowledge; [5] whether the witness ever recanted his testimony; [6] the existence of corroborating evidence; and, [7] the reasons for the witness' unavailability." *United States v. Doerr*, 886 F.2d 944, 956 (7th Cir. 1989) (citing *United States v. Snyder*, 872 F.2d 1351, 1355-56 (7th Cir. 1989)). In addition, the statements must be "offered as evidence of a material fact;" be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;" and their admission must serve "the general purposes" of the rules of evidence and "the interests of justice." Fed. R. Evid. 807.[6]

The government asserts that Brannon's statements contain "particularized guarantees of trustworthiness" such that admission of the statements against Mikos would not violate his rights under the Confrontation Clause of the Sixth Amendment. First, the Court considers whether the statements Brannon made the night of Mikos' phone call, to her sister and Individual B, are trustworthy. Defendant challenges the veracity of the statements by claiming that Brannon might have "made false statements to protect her nurse's license, because of concern of being implicated in any way in a fraud on the Government, or simply out of personal animosity." (Def.

---

[6] Rule 807 also provides that defendant must be given sufficient notice of the intent to offer such statements and the particulars thereof, which the government has done by bringing this motion.

12

Resp. at 22.) The Court acknowledges that those are questions that will remain unasked but is satisfied that the circumstances render Brannon's statements to her sister and Individual B trustworthy, for the reasons that follow.

There is no serious question as to Brannon's character for honesty and truthfulness. Brannon lived and worked at a church. She was not under investigation and had no apparent reason to lie about her conversation with Mikos or her intended testimony. Moreover, despite the defense's vague assertion, no one has suggested any conduct on Brannon's part that might implicate her in the fraud scheme or jeopardize her nurse's license. Brannon's relationship with the defendant is that of a former patient. Neither party has indicated why the doctor-patient relationship terminated, and there is no reason to believe that it ended badly or that Brannon had an axe to grind against Mikos for any reason.

Brannon told the same story regarding Mikos from the time she was first contacted by HHS Agents until the day she was murdered. *Vretta*, 790 F.2d at 659 (finding fact that victim made same statements to a number of people enhanced credibility).[7] Moreover, the statements to her sister and Individual B were not elicited by law enforcement officers or government officials but were taken from conversations Brannon initiated with her sister and trusted friends because she wanted to talk about what had just happened. These conversations occurred shortly after she hung up with Mikos, so there was little or no time for reflection, embellishment or fabrication.

Finally, the testimony the government is seeking to admit is based on Brannon's personal

---

[7] In *Vretta*, the court admitted the hearsay under Rule 804(b)(5), which at the time was considered the residual exception when the declarant was unavailable. 790 F.2d at 658. The contents of Rule 804(b)(5) have now been transferred to Rule 807. *United States v. Hall*, 165 F.3d 1095, n.8 (7th Cir. 1999).

13

knowledge of the phone call from Mikos and the treatments she received from him while under his care. None of the statements pass judgment or seek to blame Mikos, to the contrary, it appears that Brannon was simply relaying what had just transpired. The Court finds Brannon's alleged conduct and statements are consistent with those of a disinterested third party who was simply cooperating with the authorities and was bent on telling the truth because it was the right thing to do. While Brannon's statements were not given under oath or subject to cross examination, the Court finds that the circumstances set forth above and the consistency of the statements renders them trustworthy.

Next, the Court must analyze whether the statements meet the remaining criteria set forth in Rule 807. The substance of Brannon's statements are relevant to material facts, namely whether (a) Mikos submitted fraudulent claims to Medicare using Brannon as a patient, (b) interfered with the government's investigation, and (c) had a motive for murdering Brannon. Moreover, the statements are more probative than other evidence the government may offer with respect to these facts. Brannon's statements that Mikos never performed surgery on her feet and that he asked her not to testify or to lie, will not come in any other way. While there may be autopsy photographs that show lack of scarring on Brannon's feet or testimony from a medical examiner to that effect, such evidence probably would not be as probative as a direct statement from Brannon that Mikos never performed surgery on her. Further, while other witnesses may testify that Mikos attempted to persuade them not to cooperate with authorities, the evidence will not come in with respect to Brannon except by these statements. Finally, Brannon's statements that she intended to go through with testimony which would be damaging to Mikos is the best evidence of the motive for her murder. Thus, the Court finds it in the interest of justice to admit

14

testimony of Brannon's sister and Individual B regarding their conversations with Brannon on the night of January 24, 2002.

As to Brannon's remaining alleged statements, made over the next few days to Brannon's home health nurse, a church volunteer and a friend, in an abundance of caution, the Court finds they are somewhat less trustworthy and less probative and therefore are inadmissible. These statements were made after Brannon had some time for reflection.[8] Even though they are consistent with her previous statements, the passage of time weighs against their trustworthiness. *See Vretta*, 790 F.2d at 659 (stating "close proximity in time between the statement repeating the threat and the threat itself lends support to the statements' trustworthiness"). In addition, the statements made to Individuals C and E are more vague than the statements made to her sister and Individual B. For instance, according to Individual C, Brannon told her that "the doctor had called her the previous night...and wanted to talk about the deposition" she was going to give the following week. (Gov't Mot. at 8.) Individual E would testify that Brannon said Mikos "begged her not to testify" and told her that she just did not remember the operations he performed. (*Id.* at 9.) While Individual D remembers a more substantive conversation with Brannon, it contains no facts which will not otherwise come in through the testimony of Brannon's sister and Individual B. Therefore it cannot be said that the statements to Individuals C, D, and E are "more probative of the point than any other evidence." That, coupled with the fact that these particular conversations occurred one to three days after Brannon's phone call with Mikos, renders them

---

[8] Brannon's conversation with Individual C, her home healthcare nurse, did not occur until sometime the following day. Brannon's alleged conversation with a church volunteer, Individual D, took place three days after Mikos' phone call. Finally, Brannon allegedly spoke with a friend, Individual E, several times about defendant. Neither the circumstances surrounding these conversations nor the dates they took place are specified.

15

inadmissible under the residual exception.[9]

D. **Defendant's Rule 403 Challenge**

Defendant challenges the admissibility of Brannon's statements under Federal Rule of Evidence 403. As stated above, the statements are probative of material facts. The Court has little trouble concluding that admitting limited testimony from two witnesses regarding Brannon's hearsay statements, given immediately after the unusual event they describe, is on balance more probative than prejudicial.

## Conclusion

After careful consideration, the Court will allow testimony under the residual exception regarding statements Brannon made to her sister and Individual B on January 24, 2002. All other statements are excluded.

SO ORDERED.　　　　　　　　　　ENTERED: 7/15/04

　　　　　　　　　　　　　　　　　　　　　　HON. RONALD A. GUZMAN
　　　　　　　　　　　　　　　　　　　　　　United States Judge

---

[9] The statements Brannon allegedly made to Individual B sometime before January 24, 2002 regarding her interview with the HHS Agents are excluded for the same reasons.

16